I. INTRODUCTION
This matter is before the court after a trial on a stipulated record. Plaintiffs who are individuals (taxpayers) challenge actions of defendant (the department) in asserting they are liable to Oregon tax on certain transactions. This decision is the first step in resolution of the differences that separate the parties. The department has filed a counter-claim, which it agrees is rendered moot if a decision on this step of the proceedings is in its favor.
 II. FACTS
The facts have been stipulated and are, in relevant part, as follows. Individual taxpayers Terry Pinna, C.G. McKeever, James E. Bryant, and Camella L. Ryan (taxpayers) are shareholders of Crystal Communications, Inc. (Crystal), an Oregon corporation organized as an S corporation under the Internal Revenue Code (the Code).[1] During the tax years at issue, taxpayers were nonresidents of Oregon. The following sets forth the origins and functions of Crystal and its activity leading to the present appeal.
In 1988, The Cellular Corporation (TCC) solicited taxpayers to participate in the Federal Communications Commission (FCC) lottery being held to distribute licenses for the operation of cellular communication systems in rural *Page 527 
regions of the United States. In connection with the FCC lottery, TCC assisted taxpayers in forming a California general partnership named Crystal Communications Systems (the partnership) for the purpose of holding the FCC telecommunications system license for the Oregon #1 Rural Service Area (the RSA), covering Columbia, Clatsop, Tillamook, and Yamhill counties (the FCC license). The partnership agreement stated that "[t]he sole business for which the Partnership is formed shall be to carry on the business of ownership, management and operation of cellular telephone systems and applications for licensing with respect thereto." Before the lottery, the partnership entered into a Risk Sharing Agreement with TCC. TCC also did the same with several other partnerships they had assembled for the FCC lottery.
In December 1988, the partnership was selected, through the lottery, as the tentative selectee for the RSA. After reviewing the financial capability of the partnership and taxpayers' backgrounds, the FCC awarded the partnership a construction permit for the radio station and call sign for the RSA (the FCC Authorization). The FCC Authorization required the partnership to file an application for a radio station license within 18 months of the original award date; otherwise, the FCC Authorization would expire. This meant that the partnership had 18 months from the date of the FCC Authorization to construct a cell tower in at least one location of the RSA; failure would result in the partnership losing its ability to obtain the FCC license. A further requirement of the FCC Authorization was that the partnership had five years from the date of the FCC Authorization to provide complete service coverage to the entire RSA territory; otherwise, competitors would be allowed to provide service to the areas not served in the RSA. On March 21, 1991, the FCC gave the partnership the FCC license to operate a radio transmitting station.
In July 1990, the partnership contracted with McCaw Cellular Communications, Inc. (McCaw)[2] to finance the construction and operation of the RSA and to provide switch sharing, maintenance, and other related services. *Page 528 
McCaw was affiliated with Interstate Mobilephone Company (IMC), which owned the cellular licenses for the Portland and Salem metropolitan market. The partnership, McCaw, and IMC entered into an "`Agreement in Principle Regarding the Operational Cooperation'" of the RSA. The agreement stated that McCaw's responsibilities were subject to the partnership's "`continuing oversight, review, and control.'" The reason for the " `continuing oversight, review, and control'" was because the partnership was not permitted to transfer the FCC license without FCC approval. Compliance with FCC rules also prohibited control by anyone other than the partnership.
McCaw, on several occasions, attempted to purchase the partnership. In September 1991, McCaw offered to purchase 51 percent of the partnership's interests with a commitment to eliminate the FCC petitioners, discussed below. The partnership "flatly turned down this offer." Further, after receiving these offers, the partnership "made the decision to separate itself from the other risk-sharing partnerships." This was the partnership's goal and it would take precedent "other than the development of [its] market." Further, in later years, Crystal turned down additional investment offers, including one from Unique Communications Reno (Unique) and TDS (US Cellular). With regard to Unique's offer, Crystal thought the offer was "worth much more" and with regard to US Cellular's offer, Crystal "decided not to entertain as it would not be in [Crystal's] best interest at this time."
In late 1991, the partnership formed the S corporation, Crystal, for tax and liability reasons. Crystal was incorporated in Oregon on January 30, 1992, and the organization was completed in April 1992. Crystal's stated corporate purpose was to "operate a cellular telephone business in one or more territories within the United States." Each partner became a shareholder of Crystal in proportion to his or her interest in the partnership. Terry Pinna became Crystal's President. Pinna was also Crystal's sole employee. The FCC later approved the assignment of the FCC license from the partnership to Crystal, and the FCC license was formally transferred to Crystal on October 19, 1995. However, the parties agree that during the disputed tax years, 1993 to 1999, *Page 529 
Crystal was the licensee de facto and engaged in its activities for profit.
The partnership's first cell site, located in Newberg, was completed on March 10, 1991, and operational on March 22, 1991. The second cell site, located in McMinnville, was completed and operational by May 22, 1991. The partnership and later Crystal leased the land for each of these and subsequent sites, and owned the improvements on the land.[3] This included the towers, antennae, electronics, and other equipment ordinarily used to operate the cellular telephone system. Crystal, through agreements arranged on behalf of Crystal by McCaw and later ATT, entered into agreements to lease space on its cell site towers to other companies or shared in the joint development costs of a cell site.
On September 16, 1992, Crystal, McCaw, and IMC entered into an agreement for the "`construction, operation, and ownership of a cell site * * * located in Megler, Washington, and Astoria, Oregon, respectively.'" The purpose of the agreement was to develop cellular telephone service in Astoria.
McCaw, on Crystal's behalf, but subject to Crystal's direction, supervision, and approval, developed additional cell sites. On November 16, 1993, the parties signed an agreement relating to the "`development of a cell site at Cape Meares, Tillamook County.'" Crystal's responsibilities under the Cape Meares agreement remained the same as the Agreement in Principle Regarding the Operational Cooperation of the RSA and the agreement for the Megler and Astoria sites. On June 1, 1994, Pinna authorized McCaw to "`initiate work for the construction of additional cell sites located at Seaside, Mount Hebo, and [Neahkahnie] * * *." Crystal entered into a Management Agreement with McCaw and IMC on August 16, 1994, in connection with the additional sites and because of revenue sharing disputes that had arisen. Crystal also entered into a Sales, Loan, and Security Agreement and a Switch Sharing Agreement on the same date. *Page 530 
Crystal negotiated agreements with various retailers to solicit subscribers for Crystal's services. The retailers included Price Costco, Fred Meyer, and Aircall NW. In addition, Crystal opened service centers, which sold, leased, repaired, and serviced cellular and paging communications equipment and related accessories. In May and June 1996, Crystal entered into commercial leases for their service centers in Warrenton and McMinnville, Oregon, respectively. On July 3, 1996, Crystal entered into a license agreement with the Cellular One Group to use the "Cellular One" service mark, and used the mark to promote its cellular telephone service.
On behalf of Crystal and subject to Crystal's approval, ATT chose the sites for Crystal's retail outlets and service centers. ATT also provided the form contracts for the agreements with retailers and developed some of the customer subscription plans. ATT staffed Crystal's retail outlets and service centers with ATT employees. Pursuant to the management agreement, Crystal reimbursed ATT for the salaries and related employee expenses.
Crystal and McCaw agreed on a specific allocation of revenues Crystal earned from the operation of the cellular system. The revenues were first allocated to repaying McCaw for its operating expenses and for the financing it provided to Crystal. The details of the repayment arrangements were covered in the former agreements. However, after several disputes with the allocation of revenue and revenue sharing, on August 26, 1994, Crystal and McCaw entered into a new Cell Site Revenue Sharing Agreement. The new agreement, together with the former agreements, changed the cash flow, giving the revenue to Crystal first and then requiring it to repay McCaw. Disputes continued to arise under the new agreement before and after McCaw merged with a wholly owned subsidiary of ATT. Further, Crystal had regular disputes with McCaw and ATT over whether they were intruding into Crystal's RSA territory by turning up their cell towers' signal strength. As a result, Crystal hired an engineering consultant to regularly perform drive tests and monitor McCaw's and ATT's cell strength. Additionally, Pinna learned how to administer the drive test and sometimes performed the drive tests himself. *Page 531 
Terry Pinna, during this time and as the sole employee of Crystal, regularly traveled from Ohio and Florida to Oregon to oversee the acquisition and operation of Crystal's cellular communication system. Pinna's activities included following FCC litigation, communicating with shareholders, disbursing payments for corporate expenses, and exercising oversight of McCaw and ATT with respect to construction and management of the cellular communications system, including giving any needed approval on Crystal's behalf. In 1996, Pinna began staying in Oregon three to four days a month. Late in 1996, Crystal began leasing furniture and an apartment in McMinnville, as well as a 1997 Ford F-150 truck for Pinna's use.
In May 1997, after FCC approval, Crystal began preparations to sell its assets. Crystal hired Falkenberg Capital to act as its exclusive agent for the sale of its assets. On June 1, 1999, Crystal's board approved the sale of its assets to ATT for approximately $51.5 million in an installment sale. Of this amount, approximately $47.8 million was allocated to intangible property (including the FCC license) and approximately $3.7 million was allocated to the remaining property (such as the towers and equipment). With this sale, Crystal ceased all activities except the tax matters at issue here.
Most of the partnership's and subsequently Crystal's existence involved FCC litigation. In late 1989 or 1990, the partnership learned that the FCC thought that the Risk Sharing Agreement between TCC and the partnership violated FCC Regulations. The FCC initiated revocation proceedings against all lottery winners signing such an agreement with TCC, including the partnership. In late 1992, an administrative law judge revoked the license of the partnership and some 30 other parties. However, after a lengthy appeal process, in 1997, the FCC reversed that revocation. Prior to that, in October 1994, the partnership settled with private parties that had taken a position adverse to the partnership in the FCC proceedings. The FCC approved that settlement and dismissed Crystal from the proceeding in 1997 at the same time as the reversal of the Administrative Law Judge's determination. No party appealed the FCC's decision regarding Crystal, and in 1999, the FCC granted Crystal's *Page 532 
request to be severed from the other cases in the FCC proceeding. The remaining licensees had most of their licenses reinstated after a settlement with various intervenors in October 1999.
From 1993 to 1998, Crystal timely filed Oregon S corporation excise tax returns, reporting all income as Oregon-source income. Shortly before its 1999 tax filing, Crystal amended its returns for tax years from 1996 to 1998 to reapportion approximately 25 percent of its business income to Oregon. In 1999, Crystal also apportioned approximately 25 percent of its business income to Oregon, classifying the gain recognized from the sale of the FCC license as nonbusiness income, allocated to Florida. Crystal did not apportion any business income to Oregon in the 2000 tax year. In 2003, Crystal filed amended returns for tax years 1993 to 1995, reporting that one-third of its business income was apportioned to Oregon in 1993 and 25 percent of its business income was apportioned to Oregon in 1994 and 1995. For the years of 1993 to 1998, the reason for the change to apportionment was on the basis that the numerators of the payroll factor and double-weighted sales factor for Oregon equaled $0.[4]
The Department of Revenue audited Crystal for the tax years of 1993 to 2000. The auditor eliminated the payroll factor in the apportionment formula, adjusted the sales factor in the apportionment formula to include Crystal's gross receipts from the use of the FCC license, and also reclassified the gain from the sale of the FCC license received in 1999 and 2000 as business income apportioned to Oregon. The result was that nearly all of Crystal's business income was apportioned to Oregon. The department issued Notices of Deficiency to taxpayers based on this report. After a conference with taxpayers, the payroll factor was restored to the apportionment formula but otherwise all actions of the auditor involving reclassification of the FCC license were upheld. Notices of Tax Assessment were issued to taxpayers in October, 2003. *Page 533 
Taxpayers appealed the notices and the department's decision in the conference to the Magistrate Division of the Tax Court on January 16, 2004. The Magistrate Division held that Crystal operated a trade or business within Oregon and that the net taxable income for the tax years in question included the sale of the FCC license. Taxpayers, along with Crystal, appealed the decision of the Magistrate Division to the Regular Division on June 25, 2006.[5] Based on documents and deposition transcripts in the record, the parties have requested a finding of fact as to whether taxpayers intended to operate a cell system in the territory to which the FCC license applied. The court finds that taxpayers did so intend at all relevant times. As will be seen in the following analysis, the intent of taxpayers may not, however, be particularly relevant to the resolution of the question addressed here. The department has also requested a finding that the pendency of certain FCC proceedings did not prevent Crystal from selling the FCC license. Here again, although the point is of limited relevancy, the court finds, on the complete record in this case, that Crystal could have sold its rights in the FCC license at any time after the FCC license was awarded, subject to FCC approval. The pendency of those proceedings and related necessary FCC approvals would have, however, affected the structure and price in any such transaction.
 III. ISSUE
The question at this stage of the case is whether income and gain connected with the ownership and sale of an intangible asset, in this case the FCC license, is Oregon-source income to shareholders of a corporation, treated as an S corporation under ORS 314.730.[6]
 IV. ANALYSIS
1, 2. If the source of an item of income or gain is a question of the "character" of the item, ORS 314.734(2) directs that the *Page 534 
character of the item to each of the taxpayers is to be the same as the item has for federal income tax purposes. In cases where an item is not characterized for federal income tax purposes, ORS 314.734 directs that where, as here, an S corporation is involved, "[the item] has the same character for a shareholder as if realized directly from the source
from which realized by the S corporation or incurred in the same manner as incurred by the S corporation." (Emphasis added.)
3. The first question then is whether the source of an item is a matter of "character." The court is of the view that source of an item of income or gain is a matter of "character." ORS 314.734 itself strongly suggests this conclusion in that, when speaking of character, it uses an "as if the samesource" rule to resolve character matters when the Code does not specify character.
4. It then remains to be determined whether the items in question here, income from the use and sale of an intangible asset, are characterized for federal income tax purposes as being from sources in Oregon or outside of Oregon. The answer to this question is that such items are not characterized or sourced among the states of the United States for federal income tax purposes. It matters not to the Commissioner of Internal Revenue whether the items in question here were sourced in Oregon, Ohio, Florida, or any other state. The only concern of federal officials is whether the item is sourced within or without the United States, a question addressed in sections 861 through 865 of the Code.[7]
5, 6. Accordingly, the source of the income and gain realized in respect of the intangible asset in question here must be determined "as if realized [by the shareholders] directly from the source from which realized by the S corporation * * *." ORS 314.734(2). Income from intangibles, including gain from the disposition of intangible property, is Oregon-source income to an individual nonresident, "only to the extent that such income is from property employed in a business, trade, profession or occupation carried on in this state." *Page 535 
ORS 316.127(3). Under ORS 314.734 the court must, therefore, analytically "pretend" that each nonresident shareholder engaged in the same activities as Crystal.
The question thus becomes whether Crystal was engaged in a "business, trade, profession or occupation" within Oregon.See ORS 316.127(3).[8] The department does not contend that the activities conducted by Crystal constitute a profession or occupation. Therefore, the question becomes whether the activities in Oregon constituted a business or trade.
In answering this question, the first step is to determine the source of law which will provide the answer. The two possible sources are federal income tax law or ORS 316.127 standing on its own. On this point, taxpayers first take the phrase "business or trade," as essentially found in ORS 316.127, and convert it into the phrase "trade or business." They then observe that precisely that phrase is found in the federal income tax law and therefore, under ORS 316.012, must be given the same meaning as in those federal income laws.[9] The department, although asserting that it can prevail in this case under federal law, questions whether federal income tax law should displace construction of ORS 316.127 on its own.
7, 8. The question posed by the department is an appropriate question because ORS 316.012 does not require unqualified adherence to federal income tax law. Instead, it requires meanings comparable to those in the Code be used only when any "term used in this chapter" is used "in a comparable context in the laws of the United States relating to federal income taxes * * *." ORS 316.012. It should also be noted that the provisions of ORS 316.012 are clearly designed to achieve the broad policy articulated in ORS 316.007, which provides: *Page 536 
 "It is the intent of the Legislative Assembly, by the adoption of this chapter, insofar as possible, to:
 "(1) Make the Oregon personal income tax law identical in effect to the provisions of the Internal Revenue Code relating to the measurement of taxable income of individuals, estates and trusts, modified as necessary by the state's jurisdiction to tax and the revenue needs of the state;
 "(2) Achieve this result by the application of the various provisions of the Internal Revenue Code relating to the definition of income, exceptions and exclusions therefrom, deductions (business and personal), accounting methods, taxation of trusts, estates and partnerships, basis, depreciation and other pertinent provisions relating to gross income as defined therein, modified as provided in this chapter, resulting in a final amount called `taxable income'; and
 "(3) Impose a tax on residents of this state measured by taxable income wherever derived and to impose a tax on the income of nonresidents that is ascribable to sources within this state."
9. The policy stated in ORS 316.007 is one that focuses on identity of effect with respect to the measurement of the tax base — stated to be "`taxable income.'" That is the focus of subsections (1) and (2) of ORS 316.007. The focus there is the "measurement of taxable income," not the sourcing of such income as between Oregon and other states. The source is important in the case of nonresidents, but not residents, as recognized in the provisions of subsection (3) of ORS 316.007. However, the determination of source is not related to the federal concepts that are the focus of subsections (1) and (2) of the statute. Subsection (3) of ORS 316.007 stands apart from the concepts of the other subsections of the statute and could be read completely without regard to any reference to the Code.
10. The court concludes that the income measurement process, which is linked to the Code, is not a "comparable context" to that of the sourcing process. The court is, therefore, not required to follow federal meaning or construction of the term "trade or business" when that term is used to determine *Page 537 
the source of items of income gain, loss, or deduction attributable to any given taxpayer. Taxpayers have urged application of cases decided under section 162 of the Code. As those cases and that provision have to do with measurement of tax base, they are not authoritative.[10] Rather than measurement of tax base, the provisions of ORS 316.127 relate to source, a concern that focuses more on both jurisdiction to tax and legislative claims as to such jurisdiction. Before determining if there are comparable federal contexts, it is appropriate to consider some aspects of the source issue at the state level.
11. The court notes that the concern about the existence of a business, trade, profession, or occupation is only a concern in ORS 316.127 with respect to intangible property. As to real property or tangible personal property, the only other classes of property that exist, income from ownership or disposition of such property "within the state of Oregon" is all that is required. See ORS 316.127(2)(a). Why then an additional or different requirement — one related to employing the property — in the case of intangible personal property? The answer to that question is, in the opinion of the court, based on the fact that location of property is the key feature to which the statute looks in respect of source and, in the case of intangible personal property, the law has always had a difficult time "locating" intangible personal property.
12, 13. The legislature has understood that it could constitutionally reach income from property located within the borders of the state, at least on an apportioned basis. SeeAmer. Refrig. Transit Co. v. Tax Com., 238 Or 340,395 P2d 127 (1964). The identification of the location of such property was not difficult in the case of real and tangible personal property — it can be seen and located in space and time. Not so with intangible property. Such property can be of two types. First, intangible property such as goodwill or going concern value can be created by the conduct of a trade or business. Second, separately existing intangible property such as a patent, trademark, ownership interest (such as stock), or contract right can be used in a trade or business. To the extent that income can be said to be generated by intangible *Page 538 
goodwill or going concern value, that income is captured by ORS 316.127(2)(b) in cases where some aspect of the business is conducted in this state. However, in the case of a patent, a license, a share of stock, or a contract right, it is possible for a nonresident individual to simply hold the intangible and not "employ" it in a trade or business or any other activity other than passive ownership. Where employment of such an intangible in this state has not occurred, neither income nor gain in respect of the intangible is sourced to this state. Rather, the principle of mobilia sequuntur personam is applied to locate and tax the intangible, or income from it, at the situs of its owner.
14, 15. That principle of mobilia sequuntur personam
has been the subject of criticism and its application has been somewhat restricted. ORS 316.127(3) represents such a cut-back. Although income is not sourced to Oregon where the nonresident can be said to have engaged in merely passive ownership, sourcing does occur when the activities of the nonresident in respect of the intangible can be said to have gone beyond passive ownership of, and collection of income from, an intangible. Those additional activities would not have to be very significant. For example, although the mere ownership of a share of stock of an Oregon-based corporation would not subject a nonresident to taxation by Oregon, the pledge of the share of stock and the use of the proceeds of the pledge in a trade or business carried on in Oregon would, at least in the view of the department, subject the income from the intangible to taxation in Oregon. OAR 150-316.127-(D)(1)(b). The question becomes whether the intangible has some operational connection to Oregon — whether that intangible is "employed." The "employment" is the fact that causes the income or gain from the intangible, at least on an apportioned basis, to become subject to taxation in Oregon. The employment must be in a business or trade.
The basic concept, however, remains constant — has the connection of the taxpayer to the jurisdiction been of such a character that it is appropriate for a tax obligation to arise? Has the taxpayer availed himself of the benefit and protections of the state so that payment of some apportioned tax is appropriate? Where the connection is only that a "regular" corporation, in which the taxpayer owns an interest as an *Page 539 
investor, is in Oregon, the legislature has chosen not to impose tax on the income from the intangible. See ORS 316.127(3). When, however, the taxpayer employs the intangible within the state, or, for S corporations under ORS 314.734, is treated statutorily as having done so in a business or trade, the connection with the state has increased so as to subject income from the ownership or disposition of the intangible to taxation.[11] See OAR 150-316.127-(C)(3). There appears to be no question that taxpayers here benefited from the intangible license in some way. They argue, however, that the benefit was not from employment in a trade or business but rather was in the nature of a benefit from passive relicensing of the intangible in exchange for a royalty. If that were the case, the income associated with the intangible might be treated like a dividend or gain from passive ownership of stock in a regular corporation, and not subject to tax in Oregon.[12]
As stated above, if source is the issue, the comparable context in federal income tax law is not the law of section 162, as taxpayers suggest, but rather the law of subchapter N of the Code, dealing with tax based on income from sources within or without the United States. Under those provisions, it has been relevant to inquire as to whether a nonresident alien has or has not conducted a trade or business within the United States. It is apparent that similar concerns exist at the federal level as to when a nonresident has subjected himself or herself to taxation. Indeed, as recognized in the case of Shaffer v.Carter, 252 US 37, 40 S Ct 221, 64 L Ed 445 (1920), a case dealing with state taxation of nonresidents, the earliest federal income tax statutes provided that nonresidents of the United States would be subjected to an income tax on income from any "`business, trade, or profession carried on in the United States." 252 US at 54. This language bears close resemblance to the language of ORS 316.127(3). The case law *Page 540 
developed in the federal context of taxation of nonresidents under subchapter N is highly instructive.
In De Amodio v. Commissioner, 34 TC 894 (1960),affd, 299 F2d 623 (3d Cir 1962), and in Lewenhauptv. Commissioner, 20 TC 151 (1953), affd, 221 F2d 227(9th Cir 1955), the United States Tax Court was presented with fact situations in which nonresident aliens owned property within the United States and managed that property through agents acting in the United States. De Amodio,34 TC at 895; Lewenhaupt, 20 TC at 152-53. The statutes in question, like ORS 316.127, turned for their application on the question of whether the taxpayer was engaged in a trade or business within a certain jurisdiction. De Amodio,34 TC at 903; Lewenhaupt, 20 TC at 162. The Tax Court concluded, in both cases, that the property ownership constituted a trade or business where the activities of the nonresident were:
 1. Beyond the scope of mere ownership or real property, or the receipt of income from real property; and
 2. The activities with respect to the property were considerable, continuous, and regular.[13]
De Amodio, 34 TC at 905; Lewenhaupt,20 TC at 163.
The facts in each case involved ownership of property leased to third parties. Acquisition of additional property occurred. The properties were managed by agents who negotiated or renewed leases, arranged for repairs, collected rents, paid taxes, and remitted net proceeds, after deduction of commissions, to the another agent for the taxpayer who made debt service, tax, and insurance payments. In both cases, the agent undertook to consult with the taxpayer as to major decisions. A similar analysis and conclusion was present in Pinchot v.Commissioner, 113 F2d 718 (2d Cir 1940), in which the court concluded that substantial, continuous, and regular activities with respect to the asset in question constituted conduct of a trade or business. *Page 541 
The record in this case demonstrates that Crystal, and therefore, under ORS 314.734, its shareholders, were engaged in a trade or business within the framework developed in the federal case law.[14] Over an extended period of time, Crystal employed a person focused on the development of the cellular territory within which, by reason of the FCC license that is at the heart of this case, Crystal had the exclusive right to operate. Crystal's employee negotiated agreements, including leases on property located within the state. Crystal's employee entered into contracts for the purchase of equipment needed to make use of the intangible personal property that is at the center of this case. Crystal's employee also retained professional assistance in protecting the assets and worked on effectively marketing the goods and services which constituted the activity in which Crystal was engaged and were the source of the revenue Crystal received.
Overall, the activities in which Crystal engaged amounted to much more than the ownership and collection of income from an asset or the mere management of an investment. The activities of Crystal were much more "businesslike" than those of the taxpayers in De Amodio, Lewenhaupt andPinchot. The activities went far beyond mere holding of an asset and collection of income from the asset. Indeed, the asset of most importance here, the FCC license, required active development in order for Crystal to remain the owner of the asset.
Nor can this active development be considered to have been carried out by the entities to which Crystal merely sublicensed its rights. Under the governing federal regulations, surrender of management and business decision-making to another entity would have endangered Crystal's rights under the FCC license. As demonstrated in Exhibit H-4 submitted by the department,de facto transfers of FCC licenses through contract arrangements between the initial licensee and third parties can occur, but have material adverse consequences to the defacto transferor. In the FCC Opinion and Order found in Exhibit H-4, the FCC focuses on whether a licensee retains "oversight, review, supervision *Page 542 
and control." Clearly concerned with such a potential problem in its major contract for the development of its territory, Crystal was careful to make any action by its contract partner subject to the oversight, review, and ultimate control of Crystal. In a central agreement, its management agreement with IMC, all actions of the contract party were subject to the "oversight, review and control" of Crystal. This court cannot assume that these independent regulatory requirements of the relevant federal agency or Crystal's negotiated contract rights were meant to be so formalistic in nature that they could be satisfied with a recital and no substance. Crystal, employing individuals and agents, engaged in a trade or business, retaining the ability by law or contract to control its agents. Its use of agents or representatives was no different from that of the taxpayers in De Amodio, Lewenhaupt, andPinchot.
The court also notes that in important filings with the federal tax authorities, filings that produced tax benefits for Crystal, the company took the position that it was engaged in a trade or business. A valuable deduction under section 179 of the Code was claimed by Crystal for the benefit of its shareholders. That claim had to be made with respect to property "acquired by purchase for use in the active conduct of the taxpayer's trade or business * * *." Treas Reg § 1.179-4(a) (2005). The relevant regulations also make clear that a mere passive investor — the type of investor who would not be employing an intangible in a trade or business under ORS 316.127 — cannot take the benefit of the deduction under section 179 of the Code. See, e.g., Treas Reg § 1.179-2(c)(6)(ii) (2005).
16. Taxpayers have argued that in the analysis of the trade or business question, substance must triumph over form and one must examine the ability of Crystal to engage in the trade or business that the department asserts existed here. Two responses are appropriate. First, the court does not consider tax filing positions to be matters appropriate for application of the doctrine of substance over form. Although contractual arrangements or other relationships with private parties can be, at times, subjected to the doctrine of substance over form, in such cases the taxpayer, in conjunction with some other party — usually a contract party — casts *Page 543 
actions of the taxpayer in a certain form. In the case of a tax filing with the government, the position of the taxpayer is entirely the product of unilateral action of the taxpayer. Resort to the doctrine is not appropriate when a taxpayer takes a tax benefit relying on one position and then seeks to recharacterize, but not abandon, that position when a tax detriment arises. Nor can taxpayers argue that taking a position in the federal system should not impair their ability to take a different position in the state system. Taxpayers have accepted that, for these definitional matters as to trade or business, the two systems are linked where the contexts are similar. Second, taxpayers' suggestion that taxpayers cannot be in a trade or business unless the taxpayers can independently carry out all, or the primary, functions of that business, is without any support in the law. None of the federal cases discussed above so much as mentions the capacities of the taxpayers or the practical ability of the taxpayers to carry on the trade or business that was found to exist in the cases. Indeed, inLewenhaupt, a world war threatened to completely separate the taxpayer from the assets and operations that constituted the trade or business that was found to exist20 TC at 152-54.[15]
Taxpayers also attempt to cast the activities of Crystal as involving only the preservation or enhancement of the value inherent in the FCC license. That position is not supported in the record or the law. Taxpayers argue that a series of cases stand for the proposition that enhancing the value of assets does not constitute a trade or business. Whipple v.Commissioner, 373 US 193, S Ct 1168, 10 L Ed 288 (1963) is one of these cases. In Whipple, the court addressed a situation where a taxpayer advanced funds to companies in which he was a shareholder 373 US at 195. The question was whether the loans were made in trade or business. Id.
at 194-95. The court distinguished between a tax-payer engaging in operational activities of, for example, *Page 544 
developing assets for sale and an investor activity of looking for returns indirectly from the taxpayer's role as an investor.Id. at 202-03. The court found the taxpayer not to be engaged in a trade or business, even though the corporate borrower had its own trade or business. Id. at 203-04.
Taxpayers argue that they, like the taxpayer inWhipple, were mere investors seeking appreciation or investor return. However, ORS 314.734 precludes that argument. For purposes of the critical question in this case regarding source of gain or income, the statute requires the court to analyze the matter as if each shareholder was directly engaging in the activities of the corporation. Accordingly, the distinction between an investor and the entity is collapsed and the distinction made in Whipple is foreclosed. The question becomes whether the activities of Crystal are those of an investor or an operator. On that question, it is enough to look at the revenues and expenses of Crystal. The revenue, prior to liquidation, is not from dividends, interest, or sale of assets. It is rather operating revenue from customers. Like-wise, the expenses of Crystal are not limited to asset protection and management of investment returns, as was the case in Higgins v. Smith, 308 US 473, 60 S Ct 355,84 L Ed 406 (1940), another case on which taxpayers rely. Rather, the expenses were for establishing and continuing the provision of services in respect of which the operating revenues are received.
Taxpayers also cite to Commissioner v. Williams,256 F2d 152 (5th Cir 1958), Reese v. Commissioner,615 F2d 226 (5th Cir 1980), and Thomas v. Commissioner,254 F2d 233 (5th Cir 1958), each of which involve discrete and limited asset improvement and subsequent sale. However, what tax-payers did in this case was not just improve an asset and sell it. Crystal, and therefore, under ORS 314.724, taxpayers, first constructed, or gathered, a set of assets and then operated those in a way that produced operating income that increased the value of its assets.
In Williams, the taxpayer, through a partnership, acquired a partially completed vessel, completed it, and sold it in a transaction that, for him, was nonrecurring. The court held that this activity did not constitute a trade or business. *Page 545 252 F2d at 155. Here again, however, the case is not comparable. It would be comparable if the taxpayer inWilliams had purchased a hull, completed a vessel, entered a long-term charter of the vessel for revenue, and ultimately sold the vessel together with the charter agreement. That did not occur.
The taxpayer in Reese built one building with the goal of selling it to others who would operate the asset. In this case, taxpayers assembled assets and services of an employee and others to establish and improve a stream of operating income, the type of income the taxpayer in Reese never collected.
In Thomas, the taxpayer aggregated several mineral parcels and sold them in one or two nonrecurring transactions to a mining company. In this case, taxpayers did not, through Crystal, simply assemble assets for resale — they operated those assets to produce revenue streams that could be retained or capitalized and sold. Thomas, Whipple, andReece are not apposite.
Crystal and its shareholders were aware that retention of the FCC license was predicated on certain development of cellular telephone service within the territory in which the FCC license was valid. That required actions to establish service in the territory served to create value. Indeed, the record shows the standard pricing for transfers of licenses varied depending on the number of users of the service. The actions of Crystal went far beyond maintenance of value and extended to creation of value through extension of business. The court is of the opinion that in most, if not all cases, the purpose of a trade or business is the creation or enhancement of the value of the equity of the business or the value of individual business assets, or both. There are, of course, cases where little is done other than to allow external market forces to work to increase value in an asset which is only maintained. That was the case in Buono v. Commissioner, 74 TC 187 (1980), a case cited by taxpayers, in which the court stressed that legal action taken only to make certain property more marketable would not constitute evidence that the taxpayer intended to sell the property in a trade or business.[16] 74 TC at 201-02. However, in this case, *Page 546 
Crystal did not simply hold the FCC license or take limited legal action in order to allow external market forces to potentially increase the value of the FCC license. In this case, the legal actions to secure the FCC license had been completed when, through actions of its employee and agents, Crystal acquired other assets necessary to the exploitation of the FCC license, engaged with third parties to take actions for it, aggressively managed those third-party relationships and, as a result of all these actions, expanded its subscriber base so that operating revenue and the value of the FCC license and its business equity were expanded. Such actions were the conduct of a trade or business in which Crystal employed its FCC license in an operational manner.
 V. CONCLUSION
Now, therefore,
IT IS ORDERED that, the department's positions on the first aspect of this case are upheld and confirmed. The department's counterclaim is dismissed as moot. The matter is continued for resolution of remaining issues.
[1] Erica Pinna and Myra McKeever are party plaintiffs by reason of having joined in the filing of a joint return, but were not shareholders in Crystal.
[2] McCaw later merged with a wholly owned subsidiary of ATT in September 1994.
[3] McCaw entered into cell site land leases in a few instances, but later assigned all such leases to Crystal.
[4] In 1993, Crystal had no payroll, and the payroll factor was not included in the apportionment formula for 1993.
[5] Terry Pinna only appeals the Notice of Deficiency and Assessment issued by the department for the 1998 tax year. All other taxpayers appeal all Notices of Deficiency and Assessment issued by the department for the tax years of 1993 to 2000.
[6] All references to the Oregon Revised Statutes (ORS) are to the 1999 edition.
[7] All references to the Code are to 1998.
[8] The statutory concept of "to the extent that" is separately dealt with using an apportionment process in cases where the business, trade, profession, or occupation is carried on partly within and partly without Oregon. ORS 316.127(6).
[9] ORS 316.012 reads, in relevant part, "Any term used in this chapter has the same meaning as when used in a comparable context in the laws of the United States relating to federal income taxes, unless a different meaning is clearly required or the term is specifically defined in this chapter."
[10] As will be seen, however, the same essential tests from such cases are employed in other contexts in federal tax law.
[11] For a discussion of the concepts of mobiliasequuntur personam, business situs and the relationship of each to "operation" or "investment" functions of intangibles, see Jerome R. Hellerstein Walter Hellerstein, I State Taxation ¶ 8.07[2][a][v], 8-66, ¶ 9.03, 9-16 to 9-22 (3d ed 2007).
[12] The issue of the treatment of income from licensing of an intangible for use within Oregon is not before the court in this matter.
[13] It bears remembering in the application of this language that, under ORS 314.734, the court must look at the nonresident shareholder not as merely an investor in shares of Crystal, but as having conducted the very same activities in Oregon as those conducted by Crystal.
[14] It is probably the case that "tests" for trade or business status under Code section 162 do not vary materially from those under subchapter N of the Code.
[15] The cases on which taxpayers rely as to independent capacity arose under section 174 of the Code in special circumstances relating to early dispositions of intangibles that would prevent the taxpayer from ever engaging in a business. The cases did not address whether a taxpayer could engage in a trade or business through agents or employees. The legal tests in those cases, applicable to section 174 research and development, simply have no relevance to the problem at issue.
[16] Buono demonstrates the danger of merely focusing on the words "trade or business" without regard to context. It is a case involving the preference for capital gains and, like other cases under section 1221 of the Code, is concerned primarily with the taxpayer's intent with respect to property. See 74 TC at 201-01, 206-07. The court is of the opinion that taxpayer intent is not relevant to a determination of whether a taxpayer is conducting a trade or business for purposes of subchapter N of the Code or ORS 316.127 or whether a taxpayer is employing an intangible in such a trade or business. Nor does employment of an intangible in a trade or business depend on whether a taxpayer could or could not sell the intangible without federal agency approval or without impacts on structure of such sale or price of such sale. In those contexts, the inquiry is as to objective facts as to what in fact was done and do not turn on taxpayer intent or what else might have been done. *Page 547