No. 16                October 6, 2021                359

IN THE OREGON TAX COURT
REGULAR DIVISION

ORACLE CORPORATION
AND SUBSIDIARIES,
*Plaintiff*,

*v.*

DEPARTMENT OF REVENUE,
*Defendant*.

(TC 5340)

On reconsideration of whether Plaintiff's sales factor includes certain dividends and subpart F income from foreign subsidiaries, the court revised and restated its earlier conclusions. *See Oracle Corp. and Subsidiaries v. Dept. of Rev.*, 24 OTR 327 (2021). Upon review of additional context, the court concluded that "gross receipts" under Oregon's Uniform Division of Income for Tax Purposes Act includes subpart F income. The court held that the "reinclusion" clause of ORS 314.665(6)(a) requires comparison of (1) the primary business activity of the subsidiary generating the earnings and profits out of which the dividend was paid or subpart F income attributable and (2) the primary business activity of the parent. If the primary business activities are the same, then the dividend or subpart F income must be reincluded in the definition of "sales" because it is "derived from" the taxpayer parent's "primary business activity." The court left the parties to determine the factual matter of determining Plaintiff's primary business activity and the primary business activities of its foreign subsidiaries.

Oral argument on Plaintiff's and Defendant's motions for reconsideration was held remotely on June 15, 2021.

Eric J. Kodesch, Lane Powell PC, Portland, filed the motion and argued the cause for Plaintiff.

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, filed the motion and argued the cause for Defendant.

Decision rendered October 6, 2021.

**ROBERT T. MANICKE, Judge.**

In this corporation excise tax appeal, Plaintiff Oracle Corporation and certain of its domestic subsidiaries (collectively, taxpayer)[1] and Defendant (the department) cross-move for partial summary judgment regarding

---

[1] In this order, a "domestic" corporation refers to one incorporated under the laws of any state of the United States or under the laws of the United States; a

whether taxpayer's sales factor includes certain dividends and deemed dividends from foreign subsidiaries.

## I.   FACTS

The following facts are not disputed. Taxpayer's common parent, Oracle Corporation, is a Delaware corporation whose commercial domicile is in Redwood Shores, California. Oracle Corporation has many domestic and foreign subsidiaries. On behalf of itself and certain domestic subsidiaries, Oracle Corporation filed consolidated federal income tax returns for the tax years ending May 31, 2010, 2011, and 2012 (the "Years at Issue"). At least some of those domestic subsidiaries also joined in Oregon consolidated returns that Oracle Corporation filed for the Years at Issue.[2] The corporations joining in the Oregon consolidated returns were engaged collectively in a single unitary business that involves software. *See* ORS 317.710(5)(a) ("members of the same unitary group [joining in a consolidated federal return] shall file a consolidated state return").[3]

During the Years at Issue, taxpayer conducted its software business in foreign countries and jurisdictions through a network of wholly owned "controlled foreign corporations" (CFCs).[4] Some of the CFCs paid dividends to various members of the group comprising taxpayer, and taxpayer included dividend amounts in its consolidated federal taxable income. In addition, taxpayer also included in its federal taxable income certain amounts that were not paid to taxpayer but were required to be imputed to it pursuant to subpart F of the Code, IRC sections 951-965. The court, applying the

"foreign" corporation refers to any other corporation. *See* Internal Revenue Code (IRC or the Code) § 7701(a)(4)-(5) (2009).

[2] The record does not identify which domestic subsidiaries joined in the Oregon consolidated return. The court assumes that all domestic affiliates that were subject to Oregon tax (*i.e.*, that were engaged in business in Oregon and had "nexus" with Oregon) did so, as discussed below.

[3] Unless otherwise noted, the court's references to the Oregon Revised Statutes (ORS) are to 2009.

[4] Some of the CFCs were less than wholly owned, but Oracle Corporation directly or indirectly "owned a majority of stock and controlling interest" in all of them. The department has not raised an argument regarding those CFCs owned less than 100 percent by Oracle Corporation, and the court occasionally refers to the CFCs as "wholly owned."

term defined in the Code, refers to these amounts imputed to taxpayer as "subpart F income." *See* IRC § 952(a) (definition). As is common in tax literature, the parties sometimes refer to subpart F income amounts as "deemed dividends." *See, e.g.*, Cameron Postlewaite & Kittle-Kamp, *Federal Income Taxation of Intellectual Properties & Intangible Assets* ¶ 14.08[2] (Nov 2020) ("The sum of these [subpart F] income categories is imputed to the CFC's United States shareholders as a deemed dividend to the extent of the CFC's earnings and profits.").

Taxpayer treated the dividends and subpart F income from the CFCs as "dividends * * * received or deemed received" for purposes of the subtraction from the tax base that is allowed by ORS 317.267, commonly referred to as Oregon's "dividends-received deduction" statute.[5] The parties agree that 80 percent of the dividends and 80 percent of the subpart F income from the CFCs may be subtracted in computing taxpayer's Oregon taxable income. *See* ORS 317.267(2); *see former* OAR 150-317.267-(B)(4) (2012) ("Unlike the federal dividend received deduction, the Oregon deduction is permitted on dividends received or deemed received from foreign as well as domestic corporations. Income included in federal taxable income pursuant to IRC Section 951(a) qualifies for the dividend received deduction. Such income is a dividend 'deemed received.'"). Consistent with ORS 317.267(3), the parties also agree that taxpayer must exclude the subtracted 80 percent amount from its sales factor when apportioning its business income to Oregon.[6] Unless otherwise indicated, the court uses the terms "Dividends" and "Subpart F Income" to refer to the 20 percent portion of CFC dividends and subpart F income that taxpayer was required to include in Oregon taxable income after the 80 percent subtraction under ORS 317.267(2).

___

[5] The court explains the concepts of the "subtraction" from the tax base (known as "taxable income") and the "exclusion" from the "sales factor" in a background section below.

[6] The department points out that taxpayer initially reported incorrect amounts of its subtractions and exclusions for the tax years ended in 2010 and 2011, and that the department adjusted those errors, some of which adjustments were in taxpayer's favor. Taxpayer does not contest those adjustments.

On reconsideration, the parties agree on two mixed questions of fact and law: First, the CFCs are engaged in the same unitary business as taxpayer. Second, the Dividends and Subpart F Income are "business income" as defined below. Taxpayer withdrew, for purposes of this case, its alternative claim that Dividends and Subpart F Income constitute nonbusiness income.

## II.   ISSUE

At issue is whether the Dividends and Subpart F Income that are attributable to taxpayer's unitary CFCs, and are not subtracted from taxable income, are included in taxpayer's Oregon sales factor.

## III.   PARTIES' POSITIONS

Taxpayer seeks to include the Dividends and Subpart F Income in its Oregon sales factor, contending that these amounts are "sales" under ORS 314.665.[7] On its returns, taxpayer included the unsubtracted amounts only in the denominator; it did not include the unsubtracted amounts in the numerator of its Oregon sales factor, because it concluded that the amounts were "sourced outside of Oregon." Taxpayer argues that the provision that caused it to *exclude* the *subtracted* 80 percent of these amounts—ORS 317.267(3)—also implies that taxpayer must *include* the *unsubtracted* 20 percent in its sales factor. Taxpayer seeks partial summary judgment on that issue.

The department rejects taxpayer's interpretation of ORS 317.267(3). The department also argues affirmatively in its cross-motion for partial summary judgment that a provision of the sales factor statute applicable to taxpayer, ORS 314.665(6)(a), requires taxpayer to exclude the Dividends and Subpart F Income from the sales factor.

---

[7] As explained below, the sales factor is a fraction consisting of sales in Oregon divided by sales everywhere. "Including" an amount in the sales factor means that the amount must be added to the denominator, or to both the numerator and the denominator, or to neither, based on a set of "sourcing" rules. In this case, taxpayer determined that the Dividends and Subpart F Income were "sourced outside of Oregon," so it added those amounts only to the denominator. The parties' motions for partial summary judgment do not address taxpayer's "sourcing" of the Dividends and Subpart F Income; therefore, this order does not reach that issue.

Both parties' positions are based on statutory interpretation. Neither party has raised a constitutional issue.

## IV.   LEGAL BACKGROUND

### A.   *The Concepts of a Unitary Business, Apportionment, and Combined Reporting or Consolidated Returns*

This case involves three concepts that are essential to understanding Oregon's statutory approach to determining what share of the worldwide income of a business is subject to Oregon tax. The concept of a "unitary" business arose from property tax law and offered a solution to the problem of determining the tax base (property or income) for a business that operated in more than one taxing jurisdiction or through more than one legal entity. *See Coca Cola Co. v. Dept. of Rev.*, 5 OTR 405, 423-24 (1974) (tracing history), *aff'd*, 271 Or 517, 533 P2d 788 (1975). The unitary business concept has two aspects: the multijurisdictional aspect and the multiple-entity aspect. *See Cook v. Dept. of Rev.*, 23 OTR 107, 114-15 (2018). The first treats a business that spans multiple states (or countries) as one enterprise for purposes of measuring total property value or total income, which helps avoid some difficult challenges of tracing specific in-state items of income or valuing in-state items of property in isolation. *See, e.g.*, *Donald M. Drake Co. v. Dept. of Rev.*, 263 Or 26, 500 P2d 1041 (1972). The second aggregates the tax base among related legal entities that are considered to operate together sufficiently closely,[8] which avoids difficulties such as the need to police whether affiliates employ arm's-length transfer pricing when they supply one another with property or services.

---

[8] The concept of a unitary group of entities conducting a single trade or business derives from federal constitutional limitations on state taxation. *See, e.g.*, *Allied-Signal, Inc. v. Director, Div. of Taxation*, 504 US 768, 778-80, 112 S Ct 2251, 119 L Ed 2d 533 (1992). Oregon has codified a definition of a unitary "single trade or business," based on an interpretation of constitutional case law, as a business enterprise in which there is a "sharing or exchange of value" as demonstrated by "centralized management or a common executive force"; "centralized administrative services or functions resulting in economies of scale"; or a "flow of goods, capital resources or services demonstrating functional integration." *See* ORS 317.705(2), (3). Commentators sometimes use the term "enterprise unity" to refer to the multi-entity aspect of the unitary business concept. *See* Jerome R. Hellerstein & Walter Hellerstein, *State Taxation: Third Edition* ¶ 8.08[2][b][i] 4-5 (Aug 2021).

"Apportionment" is a tool to implement the multi-jurisdictional aspect of the unitary business concept. As used in state income tax law, "apportionment" is the process of determining the tax base for any one state by formula, rather than by separately accounting for each item of income with a connection to that state. *See* ORS 314.650 ("All business income shall be apportioned to this state by multiplying the income by the sales factor."). Oregon's original formula relied on the relative presence of three "factors" in Oregon (the taxpayer's property, payroll, and sales), compared to their presence everywhere. Or Laws 1929, ch 427, § 7 (net income allocated according to rules adopted by the commission); State Tax Commission Regulation (Reg.) Art. 45 (1929) (giving three-factor formula). The average of these three ratios, expressed as a percentage, was multiplied by net, or "taxable," income,[9] resulting in the share of the overall tax base that was subject to Oregon tax. In 1965, under threat of federal legislation to create a national apportionment formula, Oregon and many other states adopted the Uniform Division of Income for Tax Purposes Act (UDITPA),[10] which codified the three-factor formula for businesses other than financial organizations or "public utilities." Oregon, like many other states, has since shifted to a ratio based on only one factor: "sales" within Oregon compared to sales everywhere. *Compare* ORS 314.650 (1987) ("All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.") *with* ORS 314.650 (2009) ("All business income shall be apportioned to this state by multiplying the income by the sales factor."). UDITPA did not apportion all income by formula. Rather, "business income," as defined, was apportioned, while items

---

[9]  Oregon law described the tax base as "net income" until 1983, when Oregon adopted the federal term "taxable income" for corporations. Or Laws 1983, ch 162 § 7.

[10]  *See* Minutes, House Committee on Taxation, HB 1003, Feb 3, 1965, 3 (testimony of Ted De Looze, Assistant Attorney General, State Tax Commission) (urging enactment of UDITPA as opposed to "wait[ing] until action is taken by the U.S. Congress, which would involve as many if not more problems as this bill").

fitting within the catch-all term "nonbusiness income" were assigned entirely to one state ("allocated").[11]

"Combined" reporting and "consolidated" returns are a tool that a state can use to implement the multiple-entity aspect of the unitary business concept.[12] Although distinct, the two reporting regimes share a common feature: Transactions among the related entities joining in the combined report or consolidated return are "eliminated," resulting in a tax base that reflects only the group's aggregate income from transactions with third parties, such as customers of the unitary business. *See* Hellerstein *et al*, *State Taxation* at ¶ 8.11[1] (discussing distinctions between consolidated returns and combined reports). Dividends paid by one member of the unitary group to another, as well as intercompany sales and interest from intercompany loans, are among the types of transactions that are eliminated. *See id.* Oregon initially provided for consolidated returns for corporations by statute, but that mechanism applied only to corporations under 95 percent common ownership and, like the federal consolidated return regime, did not expressly require a unitary relationship. Or Laws 1929, ch 427, § 25; *see also* State Tax Commission Reg. Art. 47 (1929). As early as the 1940s, the department's predecessor used delegated authority to allow or require combined reporting for unitary groups, applying a 50 percent ownership threshold. *See Hines Lumber Co. v. Galloway*, 175 Or 524, 529, 154 P2d 539 (1944) (disallowing loss attributable to subsidiary found nonunitary; reciting that taxpayer included income and deduction of unitary subsidiaries on its return); *Zale-Salem, Inc. v. Tax Com.*, 237 Or 261, 391 P2d 601 (1964) (approving requirement of combined reporting for tax years ending March 1959 and 1960); State Tax Commission

---

[11] For example, rent from real property held as an investment and not within the definition of "business income" would be allocated entirely to the state where the property was located. *See* ORS 314.630(1).

[12] Of the 45 states that impose a corporate income tax, approximately 17 so-called "separate return" states generally do not require combined reporting. *See* https://www.cbpp.org/28-states-plus-dc-require-combined-reporting-for-the-state-corporate-income-tax; *see generally* Hellerstein *et al*, *State Taxation* at ¶ 8.11 (discussing combined reporting and consolidated returns, finding "no justification, in principle at least, for failing to apply formulary apportionment to the income of a group of controlled corporations that compose a unitary business").

Reg. 4.280(1)-(B) (1961). The passage of UDITPA in 1965 precipitated a statutory overhaul; although UDITPA itself did not address the concepts of consolidated returns or combined reporting, which vary from state to state, the change in law cast doubt on the department's authority to require combined reporting. *See Cook*, 23 OTR at 121-22. The legislature enacted a combined reporting statute for corporations with more than 50 percent common ownership in 1975, which remained unchanged through 1984. Or Laws 1975, ch 760, § 2, codified as ORS 314.363 (1983).

B.  *Oregon's 1984 "Water's Edge" Law Excludes Foreign Unitary Affiliates from "Consolidated" Return; Dividends from Foreign Affiliates Are No Longer "Eliminated" from Income*

        As of 1983, Oregon fully embraced one of the logical consequences of combined reporting for a unitary group: Even corporations formed under the laws of foreign countries and operating entirely abroad were required to be included in the combined report filed by an affiliate subject to Oregon tax. *See* Exhibit 15, Special House Committee on Revenue, HB 3029, July 25, 1984, at 5-6 (examples illustrating inclusion of foreign subsidiary corporation in Oregon combined report). Although the United States Supreme Court upheld the constitutionality of that approach, multinational businesses and countries including Japan, the United Kingdom and others objected to this "worldwide unitary" approach as amounting to taxation of foreign-source income in violation of national sovereignty, imposing burdensome record-keeping requirements and conflicting with international accounting norms. *See* Exhibit 3, Special House Committee on Revenue, HB 3029, July 25, 1984, at 2-3 (discussing *Container Corp. of America v. Franchise Tax Bd.*, 463 US 159, 103 S Ct 2933, 77 L Ed 2d 545 (1983)); *U.S. West/Qwest Dex Holdings v. Dept. of Rev.*, 20 OTR 342, 347 (2011). In 1983, the Secretary of the Treasury convened a working group that recommended that states voluntarily restrict their income tax base to the "water's edge." Exhibit 3, Special House Committee on Revenue, HB 3029, July 25, 1984, at 8. On July 31, 1984, the secretary declared his intention to recommend federal legislation to mandate such

a limitation if states failed to do so. Office of the Secretary, Department of the Treasury, *Final Report of the Worldwide Unitary Taxation Working Group: Chairman's Report and Supplemental Views* at iii (1984), *available at* https://books. google.com/books?id=vTGPPnYFtIcC&newbks=0&printsec= frontcover&dq=inauthor:%22United+States.+Department+ of+the+Treasury.+Worldwide+Unitary+Taxation+Working+ Group%22&hl=en#v=onepage&q&f=false; Hellerstein *et al*, *State Taxation* at ¶ 8.18.

At the same time, in July 1984, Governor Victor Atiyeh convened a one-day special legislative session, at which the legislature adopted his proposal for a water's-edge approach that would exclude the income of foreign affiliates from the Oregon tax base. The new law adopted the federal consolidated return regime, which generally included within the consolidated return all domestic affiliates of which the common parent directly or indirectly owned at least 80 percent of the stock but excluded all foreign affiliates no matter the percentage of ownership. Or Laws 1984, ch 1; Exhibit 2, Special House Committee on Revenue, HB 3029, July 30, 1984 (Revenue Analysis); *see* IRC § 1504(a)(1) (1983) (defining "affiliated group" to mean "1 or more chains of includible corporations" that meet certain criteria); *id.* § 1504(b)(3) (1983) (excluding foreign corporations from the definition of "includible corporations").[13] The 1984 Oregon act retained the concept of a unitary group[14] and contained mechanisms to apply the federal intercompany transaction elimination regulations to those domestic corporations engaged in a unitary business and joining in a consolidated return.[15] The

---

[13] Under federal law, corporations formed under the laws of foreign countries and other non-United States jurisdictions generally are not subject to income tax unless they have United States-source income or income effectively connected with the conduct of business in the United States. *See generally*, Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶¶ 65.3.1, 65.3.2, 67.1.1. As an extension of this principle, foreign corporations such as the CFCs in this case are excluded from a consolidated return.

[14] *See* ORS 317.705(2) (1985) ("'Unitary group' means a corporation or group of corporations engaged in business activities that constitute a single trade or business.").

[15] *See, e.g.*, ORS 317.710(5)(a) (1985) (requiring affiliates joining in federal consolidated return to join in Oregon consolidated return if unitary and subject to Oregon tax).

resulting Oregon consolidated return regime functioned similarly to the prior combined reporting regime but was limited to domestic, unitary, 80 percent affiliates.

C.   *First Statute at Issue (1984): Although Not "Eliminated," a Large Portion of Dividends Is "Subtracted" from Income under ORS 317.267(3) (so-called "Dividends-Received Deduction")*

The 1984 law thus fundamentally changed the tax treatment of a domestic parent corporation with respect to its foreign unitary subsidiaries. Before the 1984 law, income that the foreign subsidiaries earned from dealings with third parties was pooled with the income earned by domestic subsidiaries and the parent itself. Dividends that the parent received from domestic and foreign unitary subsidiaries were eliminated from income as intercompany transactions. After the 1984 law became effective, a domestic parent was required to treat foreign-subsidiary dividends as income (along with dividends from nonunitary corporations) and to apply UDITPA to determine what amount of the dividends, if any, would be assigned to Oregon as (1) "business income" based on the formulary apportionment rules; or (2) "nonbusiness" income directly allocable to Oregon, as opposed to another state. The impact of this change on US-headquartered enterprises with foreign subsidiaries was lessened by a "subtraction" provision in the 1984 law, which reduced the *amount* of virtually all kinds of uneliminated business income from dividends substantially, by 80 percent (taking into account a 1987 amendment).[16] This revision to ORS 317.267 meant that the problematic task of determining whether and how to apportion or allocate the dividend income pursuant to UDITPA was limited to only the remaining "unsubtracted" 20 percent of the dividend income.

---

[16] The 1984 act provided for a subtraction of 85 percent of the dividend; the 1987 legislature changed the subtraction to 80 percent of the dividend. Or Laws 1987, ch 293, § 39 (amending ORS 317.267(2)). An amendment in 1989 changed the subtraction to 70 percent, except for dividends from a corporation of which the payee owned at least 20 percent of the stock. *See* Or Laws 1989, ch 625, § 21 (adding paragraph (c) to ORS 317.267(2)).

D. *Dividends Not Eliminated or Subtracted Are Either Apportionable "Business Income" or Specifically Allocable "Nonbusiness Income" under UDITPA; Federal Constitutional Principles*

If a dividend was not eliminated in a consolidated return, any portion not subtracted under ORS 317.267 was required to be apportioned by formula if it fit within the definition of "business income." If it did not fit within that definition, it was, *per se*, "nonbusiness" income and was required to be allocated to Oregon only if the payee's commercial domicile was in Oregon. *See* ORS 314.610(5) ("'Nonbusiness income' means all income other than business income."); ORS 314.640 ("Interest and dividends are allocable to this state if the taxpayer's commercial domicile is in this state."). Although in this case the parties now agree that the Dividends and the Subpart F Income are business income, the court sets forth the definition of that term here because the court finds its components relevant for purposes of the later discussion of the 1995 law at issue:

> "'Business income' means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."

ORS 314.610(1). The Oregon Supreme Court, like a number of courts in other states, has held that the statutory definition has two parts, a "transactional test" and a "functional test." "If the income in question satisfies either test, then it may be apportioned as 'business income.'" *Pennzoil Co. v. Dept. of Rev.*, 332 Or 542, 546-47, 33 P3d 314 (2001). Under the "transactional test," business income is "income arising from transactions and activity in the regular course of the taxpayer's trade or business." *Id.* at 547 (internal quotation marks omitted). Under the "functional test," income from tangible and intangible property is business income if "the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." ORS 314.610(1);

*see Willamette Industries, Inc. v. Dept. of Rev.*, 331 Or 311, 15 P3d 18 (2000).

The "functional" test under UDITPA has a counterpart concept under constitutional law that focuses on whether the property serves an "operational function" in the business,[17] as opposed to an "investment function." A state may constitutionally require apportionment if the property generating the income serves an operational function in the recipient's business, even if the property is stock in a corporation that is not engaged in the same unitary business as the recipient. *See Allied-Signal*, 504 US at 787-88.[18] In a case involving dividends from a unitary subsidiary that were not eliminated under combined reporting, the Court held that the dividends were apportionable. *Mobil Oil Corp. v. Commissioner of Taxes*, 445 US 425, 100 S Ct 1223, 63 L Ed 2d 510 (1980).

E.   *Under Pre-1995 Law Dividends that Were Business Income Were Apportioned Based on the Location of the "Income-Producing Activity"*

For dividends or other items apportionable as business income, the next step was to apply the statutes prescribing the apportionment formula, of which one of the three factors was the ratio of "sales" within Oregon to "sales" everywhere. Before 1995, determining the sales factor required (1) testing whether the item—more specifically, the gross receipts comprising that item—fit within the definition of "sales" in ORS 314.610(7), and if so; (2) applying one of two "sourcing" methods to determine whether the item should appear in the numerator of the sales factor as a sale "in this state," increasing the percentage of total net income apportioned to Oregon. The definition of "sales" contained no

---

[17] The United States Supreme Court has stated that the definitions of business income and nonbusiness income under UDITPA "may be quite compatible with the unitary business principle," but has stopped short of equating the UDITPA terms with the constitutional concepts of apportionable and nonapportionable income. *See Allied-Signal, Inc. v. Director Div. of Taxation*, 504 US 768, 786-87, 112 S Ct 2251, 119 L Ed 2d 533 (1992).

[18] Commentators also use the term "asset unity" to describe the relationship between a business entity and property that generates apportionable business income because the property serves an operational function. *See* Hellerstein *et al*, *State Taxation: Third Edition* ¶ 8.08[2][b][i] at 4-5 (Aug 2021) (describing "asset unity" and "enterprise unity").

limitations relevant to this case; the text simply read: "'Sales' means all gross receipts of the taxpayer not allocated under ORS 314.615 to 314.645." ORS 314.615 to 314.645 were all of the provisions for allocating items of nonbusiness income to one specific state. Therefore, if the income was business income, it also fit within the definition of "sales."

As to the "sourcing" methods, UDITPA contained one method for sales of tangible personal property, and another method for all other kinds of sales, reflecting UDITPA's origins at a time when the national economy was dominated by the manufacturing and sale of goods. Sales of tangible personal property generally were in this state if the property was delivered in this state. *See* ORS 314.665(2)(a) (1993). Any other kind of sale was in this state if the "income-producing activity" was in this state. ORS 314.665(4) (1993).[19] UDITPA did not define "income-producing activity." The court discusses the meaning of that term in its analysis below.

F.   *Second Statute at Issue (1995): ORS 314.665(6) Excludes Certain "Intangibles" Income from the Sales Factor*

In 1995, the legislature enacted the second major statute at issue in this case, which narrowed the definition of "sales":

> "For purposes of this section, 'sales' excludes:
>
> "(a)  Gross receipts arising from the sale, exchange, redemption or holding of intangible assets, including but not limited to securities, unless those receipts are derived from the taxpayer's primary business activity."

ORS 314.665(6)(a).[20]

----

[19] Alternatively, if the income-producing activity was both within and without Oregon, the sale was in Oregon if the greater proportion of the income-producing activity was in Oregon, based on "costs of performance." *Id*.

[20] The 1995 law also excluded from "sales":

> "Gross receipts arising from an incidental or occasional sale of a fixed asset or assets used in the regular course of the taxpayer's trade or business if a substantial amount of the gross receipts of the taxpayer arise from an incidental or occasional sale or sales of fixed assets used in the regular course of the taxpayer's trade or business. Insubstantial amounts of gross receipts arising from incidental or occasional transactions or activities may be excluded from the sales factor unless the exclusion would materially affect the amount of income apportioned to this state."

Or Laws 1995, ch 176, § 1 (1995) (adding subsection (b) to ORS 314.665(6)). A 1999 amendment limited the exclusion under ORS 314.665(6)(a) in ways not relevant

As explained in *Tektronix, Inc. v. Dept. of Rev.*, 354 Or 531, 545, 316 P3d 276 (2013), the legislature intended to address the so-called "'treasury function' problem: gross receipts from the sale of short-term liquid assets that a corporation used to store cash for business purposes" at least arguably constituted "sales" and thus were included in the denominator of the sales factor. However, when the buying and selling of securities "'really isn't [the] business'" of the taxpayer, including a high volume of such receipts in the denominator could dilute the sales factor for most states while inflating it for the state where the largest share of the "income-producing activity" of overseeing and carrying out the securities trades took place. *See id.* (quoting Tape Recording, House Committee on State and School Finance, HB 2203, Apr 25, 1995, Tape 186, Side A) (statement of Steve Bender, Legislative Revenue Office). As the Supreme Court held, the 1995 legislature did not limit the exclusion from "sales" to gross receipts from the sales of securities; the court concluded that "gross receipts arising from the sale *** of intangible assets" encompassed the taxpayer's receipts from selling the goodwill identified when the taxpayer sold an entire division of its business to a competitor. *See id*.

The final clause in ORS 314.665(6)(a) creates an exception that "reincludes" (the court's term) gross receipts that previously were excluded from "sales," if those receipts are "derived from the taxpayer's primary business activity," another undefined term analyzed below.

G.  *Overview of Steps to Determine Oregon Taxable Income for Years at Issue*

With the foregoing historical background in mind, the court now turns to the Years at Issue and briefly lays out in sequence the six main steps to determine the Oregon taxable income of a multinational group of affiliated corporations, focusing on the steps at which the "dividends-received

---

to this case, declaring that "sales" "[i]ncludes net gain from the sale, exchange or redemption of intangible assets not derived from the primary business activity of the taxpayer but included in the taxpayer's business income." Or Laws 1999, ch 143, § 8 (adding subsection (b) to ORS 314.665(6) and renumbering the "occasional sale" provision as new subsection (c)).

deduction" and the apportionment formula apply. *See generally StanCorp Financial Group, Inc. v. Dept. of Rev.*, 21 OTR 120 (2013); *Costco Wholesale Corp. v. Dept. of Rev.*, 20 OTR 537 (2012); *US West*, 20 OTR 342.

The first step is to determine the "taxable income" under federal income tax law of the relevant group of domestic affiliates. In this case, Oracle Corporation joined with domestic affiliates in filing a federal consolidated income tax return for each of the Years at Issue, which generally means that the separate income and losses of Oracle Corporation and those affiliates were pooled, and intercompany dividends and other transactions among members of that group were eliminated. Those domestic affiliates that were subject to Oregon tax because they carried on business in Oregon and met the constitutional "nexus" requirements for taxation also were required to join in filing an Oregon consolidated return, and the Oregon starting point became the federal "consolidated" taxable income of the larger domestic group filing federal consolidated returns. *See* ORS 317.070 (imposing tax on corporation "doing business" within the state); *Capital One Auto Finance, Inc. v. Dept. of Rev.*, 22 OTR 326 (2016) (constitutional "nexus" analysis), *aff'd on statutory grounds*, 363 Or 441, 423 P3d 80 (2018); ORS 317.715(1) (starting point is federal consolidated taxable income). This means that the CFCs' income and losses were *not* pooled with those of the consolidated group, and dividends from the CFCs were not eliminated from the income of the consolidated group. Therefore, Oregon's starting point (federal consolidated taxable income) did not include the CFCs' income or losses, but it did include dividends the CFCs paid to the corporations that joined in the federal consolidated return, as well as subpart F income deemed to have been received from the CFCs.

The second step is to determine whether the federal consolidated group consists of more than one "unitary group"; if so, each separate unitary group doing business in Oregon may be required to file its own Oregon consolidated return. *See* ORS 317.715(2) (requiring separation of multiple unitary groups). In this case, this step is irrelevant because the parties have raised no issue of multiple unitary groups.

The third step is to apply the various "additions," "subtractions," and other modifications to federal consolidated taxable income that Oregon law prescribes. *See* ORS 317.715(3)(a). The "dividends-received deduction" under ORS 317.267 is the modification that occurred in this case; taxpayer's motion relies on that statute. When a corporate taxpayer receives a dividend from a corporation outside the consolidated return group, federal law generally allows the payee to claim a deduction for a specified portion of that dividend. *See generally* IRC § 243. Subsection (1) of ORS 317.267 generally requires the taxpayer to add that deducted amount back to federal taxable income. With the slate thus clean, subsection (2) allows the taxpayer to subtract 80 percent of the dividend, assuming that the taxpayer has at least a 20 percent ownership interest in the payor.

Assuming that the unitary business is taxable in more than one state, the fourth, fifth, and sixth steps determine Oregon's taxable share of post-modification income, applying the "allocation" and "apportionment" laws discussed above, including the definition of "sales" in ORS 314.665(6)(a) that is the subject of the department's motion. *See* ORS 317.010(10)(a)-(c); ORS 314.605-314.670. Step four is to subtract all nonapportionable "nonbusiness" income; step five is to multiply the remaining amount (apportionable "business" income) by the percentage determined by the Oregon apportionment formula; and step six is to add back any amounts of nonbusiness income that must be "allocated" to Oregon. The result of these six steps is "Oregon taxable income."

H.   *Definition of "Dividend"; Treatment of Subpart F Income*

As a final piece of legal background, the court discusses the definition of the key term "dividend" and its relation to subpart F income.

1.   *Definition of "dividend"*

"Dividend," as used in federal and Oregon income tax law, has a specific meaning. During the Years at Issue, as well as in 1995 when the legislature adopted ORS 314.665(6)(a), and in 1984 when the legislature incorporated the federal consolidated return regime as a water's-edge mechanism,

section 316 of the Internal Revenue Code defined "dividend" as "any distribution of property made by a corporation to its shareholders *** out of its earnings and profits ***."[21] IRC § 316(a).[22] A distribution thus qualifies as a "dividend" for income tax purposes only when paid out of "earnings and profits." As a leading commentator explains:

> "So long as a corporation's original shareholders retain their stock, the reason for gearing the taxability of distributions to the corporation's record of earnings and profits is clear enough. Until a corporation has profits, any distribution to shareholders is a return of their investment rather than income. Once the corporation has realized profits, distributions may pro tanto be fairly regarded as income to the stockholders."

Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 92.1.1.

Although Congress has not defined "earnings and profits," and exact computations can be complex, "earnings and profits" is related to the corporate law term "surplus" and to the income tax term "taxable income," and the amount of earnings and profits is "usually computed starting from taxable income." *Id.* ¶ 92.1.3. "'[T]he amount of the earnings and profits in any case will be dependent upon the method of accounting properly employed in computing taxable income,' thus precluding a corporation from computing taxable income with the cash method of accounting and earnings and profits with the accrual method, or vice versa." *Id.* (quoting Treas Reg § 1.312-6(a) (2020)); *see also* Treas Reg § 1.312-6(a) (quoted text identical).

### 2. *Subpart F Income as "gross receipts"*

On reconsideration, the court revises its original conclusion regarding whether the Subpart F Income should be

---

[21] "Property" included "money," as well as any other property other than the payor's own stock. IRC § 317(a) (2018); *see also* IRC § 317(a) (1994); IRC § 317(a) (1982).

[22] Oregon's definition before incorporating the federal definition was materially the same. *See* ORS 317.010(7) (1981) ("'Dividend' means any distribution (except distributions in complete or partial liquidation of a corporation) made by a corporation to its stockholders, whether in money or in other property, *** out of its earnings or profits whenever accumulated ***."); ORS 317.010(7) (1961) (same).

treated in the same manner as the Dividends for apportionment purposes, specifically, whether the Subpart F Income fits within the definition of "sales" as "all gross receipts of the taxpayer not allocated under ORS 314.615 to 314.645." ORS 314.610(7). The court's original opinion concluded that the Subpart F Income, which is required to be included in federal taxable income but is not actually paid, did not constitute gross receipts as the Oregon legislature would have understood that term in 1965, based on Oregon case law and other sources suggesting that gross receipts include only amounts actually received in cash. *Oracle Corporation and Subsidiaries v. Dept. of Rev.*, 24 OTR 327, 340-48 (2020). Both parties disagreed with that conclusion. On reconsideration, the court is persuaded by a contemporaneous statutory definition of "received," along with other strong contextual evidence, that the legislature intended "gross receipts" to be construed according to the taxpayer's tax accounting method. *See* ORS 317.010(13) (1965). Subpart F functions essentially as a mandatory accounting method, preventing domestic controlling shareholders from using the simple postponement of the payment of dividends to indefinitely defer income earned by foreign-incorporated subsidiaries. Accordingly, the court now agrees that the Subpart F Income constitutes gross receipts for apportionment purposes and is treated in the same manner as the Dividends that some of the CFCs actually paid to taxpayer. The details of the court's reasoning do not directly affect the remaining issues in the case. However, because the court's conclusion has changed, the court feels obliged to briefly discuss them in the following paragraphs.

The term "gross receipts" is not defined in UDITPA or elsewhere in chapter 314. Applying the framework of *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009), the court first reviews contemporaneous general and legal dictionaries to identify the plain meaning and any "technical" meaning of the term when the Oregon legislature used it in UDITPA in 1965. *See Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 295-96 & n 7, 337 P3d 768 (2014) (stressing the importance of consulting dictionary definitions contemporaneous with enactment of the statute). At that time, neither *Webster's Third New International Dictionary* nor *Black's*

*Law Dictionary* included a definition of "gross receipts." The relevant definitions of "receipt" in *Webster's* referred to the verb "receive," the primary definition of which was "to take possession or delivery of." *Webster's Third New Int'l Dictionary* 1894 (unabridged ed 1961). *Black's Law Dictionary* contained similar definitions. *Black's Law Dictionary* 1433 (4th ed 1951) (defining "receipt" in pertinent part as the "[a]ct of receiving; also, the fact of receiving or being received; that which is received; that which comes in, in distinction from what is expended, paid out, sent away, and the like"; defining "receive" as "[t]o take into possession and control; accept custody of"). The court concludes that the plain meaning, as well as the general legal meaning, of "receive" and its derivative "receipt" referred to the act of taking something into possession. Standing alone, this definition would seem to limit gross receipts to amounts actually received as cash, as the court concluded in its original decision.

The court turns to relevant context, starting with other contemporaneous Oregon income tax statutes. *Gaines*, 346 Or at 177 n 16 ("Ordinarily, only statutes enacted simultaneously with or before a statute at issue are pertinent context for interpreting that statute."). ORS 317.010(13) (1965) contained the following definition:

> "'Received,' for the purpose of the computation of net income under this chapter, *means 'accrued or received.'* The words *'accrued or received'* shall be construed *according to the method of accounting* upon the basis of which the net income is computed under this chapter."

(Emphases added.) *See also* ORS 316.010(13) (1965) (similar, for personal income taxpayers); ORS 317.160-317.195 (1965) (specific tax accounting provisions for corporations). This definition deviates from the plain and technical meanings of "receive" discussed above and instead looks to the taxpayer's "method of accounting" to determine whether and when an item is considered received. Oregon's tax accounting method laws at that time were similar to those under federal law. *See former* State Tax Commission Reg. 314.275 (1965) (identifying ORS 314.275 (1965) as "modeled after" IRC section 481 (1954) (governing change in taxpayer's

accounting method)); *but see Lottis v. Commission*, 2 OTR 434, 438 (1966) (identifying differences and determining that department's predecessor not "bound to follow the federal interpretation although it does so in many instances"); *see also Ruth Realty Co. v. Tax Commission*, 222 Or 290, 294, 353 P2d 524 (1960) (noting apparent legislative intent to "harmonize" Oregon income tax laws with federal law, "particularly * * * where the laws involve methods of accounting relating to similar transactions subject to tax by both state and federal authority"). Oregon and federal income tax law recognized the concepts of cash-method and accrual-method accounting, as well as other methods. *See* ORS 314.275 (1965) (citing examples of changed methods of accounting); ORS 317.265(2) (allowing elective method for deducting property taxes for accrual-method corporate taxpayers); IRC § 446 (1964) (requiring taxpayers to compute taxable income using, among other permissible methods, accrual method or cash receipts and disbursements method; limiting taxpayer's ability to change methods without consent of Internal Revenue Service). Although neither Oregon tax statutes nor the contemporaneous versions of the Internal Revenue Code and Treasury regulations contained an all-purpose definition of "gross receipts," statutes,[23] regulations,[24] and case law[25]

---

[23] *E.g.*, *former* IRC § 970(a)(1)(B) (1964) (allowing CFC shareholders to defer certain "export trade income" of CFC, subject to limitations including "10 percent of * * * gross receipts * * * *accruing to*" CFC from certain export trade income).

[24] *E.g.*, *former* IRC § 1372(e)(4), (5) (1964) (corporation's status as S corporation terminates if "more than 80 percent of its gross receipts" are from sources outside United States or "such corporation has gross receipts more than 20 percent of which is derived from" certain passive sources); *former* Treas Reg § 1.1372-4(b)(5)(ii) (1961) ("The term 'gross receipts' means the total amount *received or accrued under the method of accounting used by the corporation in computing its taxable income*." (Emphasis added.)); *see Branch v. United States*, 20 AFTR 2d 5302 (ND Ga 1967) (construing regulation; determining that certain option payments were gross receipts to taxpayer when accrued to accrual-method taxpayer, not when received in the form of cash).

[25] *See, e.g.*, *Pursell v. Comm'r*, 38 TC 263, *aff'd*, 315 F2d 629 (3d Cir 1963) (applying "transitional adjustment" rules to taxpayer who changed from cash method of accounting to accrual method; requiring taxpayer to treat cash amounts as gross receipts in first year of accrual method, where amounts would have been accruable in prior year when taxpayer used cash method); *Reaver v. Comm'r*, 42 TC 72 (1964) (allowing spouses operating a small business to elect annual installment method of accounting to report gain from one-time sale of business real property; rejecting Internal Revenue Service argument that taxpayers were required to treat entire gain as income in year of transaction because they originally reported their cash payments as "gross receipts").

in various areas established clearly that the taxpayer's method of accounting determined whether and when an amount was counted in "gross receipts" for income tax purposes.

Additional context supports the view that the 1965 legislature likely intended "gross receipts" to have a meaning consistent with the manner in which gross income, deductions and other items are taken into account in determining "net" or "taxable" income. First, in one instance the definition of "sales" in UDITPA seems to treat the term "gross receipts" as interchangeable with "income": "'Sales' means all gross receipts of the taxpayer not allocated under ORS 314.615 to 314.645." ORS 314.610(7). Yet the allocation provisions themselves refer to the allocation of "nonbusiness *income*" (emphasis added), not gross receipts. *See* ORS 314.615 (requiring taxpayer to "allocate and apportion the *net income* of the taxpayer" (emphasis added)); ORS 314.625 (requiring allocation of rents, royalties, capital gains, etc., to Oregon "to the extent that they constitute *nonbusiness income*" (emphasis added)); ORS 314.610(5) (defining "nonbusiness income" as all *income* other than business income" (emphasis added)). Second, as the department points out in its response on reconsideration, ORS 314.665(4) has always provided that "sales" of "other than tangible personal property" are in Oregon "if (a) the *income-producing activity* is performed in this state; or (b) the *income-producing activity* is performed both in and outside this state and a greater proportion of the *income-producing activity* is performed in this state than in any other state, based on costs of performance."[26] (Emphases added.) Although a term used in defining the tax base is not always relevant context for a term used in apportioning the tax base,[27] the court concludes that the legislature itself has established a link between "gross receipts" for

---

[26] In pointing out the connection in ORS 314.665(4) between "sales" and "income," the department preserves its argument that the Dividends and Subpart F Income in this case nevertheless are excluded from "sales" by later amendments to Oregon's UDITPA.

[27] *See, e.g.*, *Crystal Communications, Inc. v. Dept. of Rev.*, 19 OTR 524, 536-37 (2008) (in interpreting "business, trade, profession or occupation" for purposes of apportioning nonresident's income from intangibles under ORS 316.127(3), court not required to follow federal meaning of "trade or business" as used to determine "taxable income").

income tax accounting purposes and for apportionment purposes.[28]

The court has found nothing relevant to this issue in the written materials comprising the legislative history of Oregon's adoption of UDITPA, nor in the available recordings of oral proceedings. Based on the statutory text and context of ORS 314.610(7), the court concludes that the legislature intended "gross receipts" to be defined consistently with taxpayer's method of accounting for income tax purposes.

The court next analyzes whether this conclusion extends to the treatment of subpart F income. Although subpart F is not framed as an accounting method, its purpose overlaps substantially with that of an accounting method: to "clearly reflect" actual income. *See former* ORS 317.160 (1965) (requiring corporate taxpayers to use their regular book accounting method "unless such method employed does not clearly reflect the net income"); *former* IRC § 446 (similar; allowing Internal Revenue Service to prescribe accounting method for taxpayer whose regular method "does not clearly reflect income"). Case law as of 1965 establishes that the timing of inclusion of items in income was a key issue in determining whether an accounting method clearly reflected income. *See, e.g.*, *Kuhns et ux v. State Tax Com.*, 223 Or 547, 551, 355 P2d 249 (1960) (finding "no question" that member of agricultural cooperative would have income from patronage dividends; declaring "The crucial question is 'when?'"; rejecting State Tax Commission's effort to substitute an accounting method that would include patronage dividends in income upon issuance of a certificate therefor under *former* ORS 316.160 (1953)); *Branch*, 20 AFTR 2d 5302; *Pursell*, 38 TC 263.

---

[28] The court's original order relied in part on *Corbett Inves't Co. v. State Tax Com.*, 181 Or 244, 181 P2d 130 (1947). In that case, the court determined that "gross receipts" for purposes of an Oregon corporation excise tax exemption had the same meaning as "gross income" and referred to gain on the sale of real property rather than total gross proceeds. On reconsideration in this case, the parties correctly point out that *Corbett* did not involve deferral or other timing-related accounting issues. Because the court is persuaded that those latter issues are the proper focus of its contextual inquiry, the court now concludes that *Corbett* sheds little light on the issues in this case.

The principal purpose of subpart F, as summarized by the Internal Revenue Service, is to prevent domestic United States shareholders from engaging in unlimited deferral of higher-rate United States income taxes on income earned by foreign subsidiaries operating abroad. *See* TD 8767, 1998-1 CB 875 ("Subpart F was enacted by Congress to limit the deferral of U.S. taxation of certain income earned outside the United States by foreign corporations controlled by U.S. persons.").[29] The opportunity for deferral arises when domestic owners of foreign corporations can choose to cause the foreign subsidiaries to not pay dividends. *See* Bittker & Lokken, ¶ 69.1 (quoting S Rep No 1881, 87th Cong, 2d Sess ("[N]o U.S. tax is imposed with respect to the foreign source earnings of these corporations . . . until dividends paid by the foreign corporations are received by their American parent corporations or their other American shareholders." (Ellipsis in original.)). Subpart F income is a collection of specific types of income of the CFC, each of which is separately computed according to rules designed to limit any incentive to shelter that type of income from US or foreign tax, or (in some cases) to punish overtly illegal behavior such as the payment of bribes or kickbacks. *See id.*; Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations & Shareholders* ¶ 15.62[1] (Nov 2020) (explaining computation of subpart F income). The CFC shareholder must include in federal gross income the sum of these items, capped by the CFC's earnings and profits for the year. *See* IRC §§ 951(a)(1), 952(c)(1)(A). When a CFC pays an actual dividend, the payment generally reduces the CFC's earnings and profits for the year; thus, to the extent the CFC pays actual dividends, the amount that the US shareholder must include as subpart F income is generally reduced as well. *See* Bittker & Eustice, ¶ 15.61[3].

---

[29] A historical study offers a more nuanced view of the varied motivations and intentions that led to the enactment of subpart F, including concerns about abusive practices involving "paper transactions" in "tax haven" jurisdictions. *See* 1 National Foreign Trade Council, *International Tax Policy for the 21st Century*, ch 2 at 52 (2001), *cited in* Bittker & Lokken, ¶ 69.1 n 14, *available at* https://www.nftc.org/default/tax/fip/NFTC1a%20Volume1_part1.pdf. The study concludes, however, that limiting abuse by limiting the deferral of income was the principal motivator. *See* National Foreign Trade Council, *International Tax Policy for the 21st Century* at 56 ("[C]oncerns about the protection of the U.S. tax base moved Congress to end deferral for certain categories of income that were deemed to be most susceptible of being moved out of the United States for tax reasons.").

Subpart F, therefore, differs from an accounting method in that subpart F prescribes a set of mandatory requirements for the inclusion of items in income, while a tax "accounting method" generally is based or overlaid on the taxpayer's own existing book accounting method. Nonetheless, the court concludes that the statutes governing accounting methods and the income inclusion requirements under subpart F share the same important goals of regulating when income is recognized in relation to when the underlying business activity occurs. Because the court concludes that the drafters of UDITPA and the Oregon legislature intended "gross receipts" for apportionment purposes to be recognized based on the taxpayer's accounting method, the court also concludes that "gross receipts" under Oregon's UDITPA includes amounts included in income under subpart F.

## V.   ANALYSIS OF PARTIES' ARGUMENTS

A. *Taxpayer's Issue: Does ORS 317.267(3) require inclusion in "sales" of the unsubtracted portions of the Dividends and Subpart F Income?*

In its Motion for Partial Summary Judgment, taxpayer relies on subsection (3) of ORS 317.267, which states:

"There shall be excluded from the sales factor of any apportionment formula employed to attribute income to this state any amount subtracted from federal taxable income under subsection (2) of this section."

Taxpayer urges the court to determine that, because subsection (3) requires it to exclude the 80 percent of the Subpart F Income and Dividends that taxpayer subtracted, subsection (3) also necessarily requires taxpayer to include the unsubtracted 20 percent. Taxpayer describes its position as the "clear corollary" of ORS 317.267(3) and relies on the principle of statutory interpretation known as "*inclusio unius est exclusio alterius*" (the inclusion of the one is the exclusion of the other), and on ORS 174.020(2), which states that "a particular intent controls a general intent" when the two are inconsistent.

Under the analytical framework that the Oregon Supreme Court has prescribed for interpreting statutes, the court starts not with the maxims taxpayer cites, but with the text and context, as well as any helpful legislative history, before consulting maxims "if the legislature's intent remains unclear." *Gaines*, 346 Or at 171-72. The text of subsection (3) does not state that the unsubtracted portion of a dividend must be included in an apportionment formula. The text does not specify whether the unsubtracted portion must be included or excluded. This silence can mean one of three things: (a) the legislature intended to imply that the unsubtracted portion must be included; (b) the legislature intended to imply that the unsubtracted portion must, like the subtracted portion, be excluded (a position neither party advances here); or (c) the legislature did not intend subsection (3) to answer the question. The court proceeds to statutory context for any further insight.

Statutory context includes other laws in place at the time of enactment. *See Unger v. Rosenblum*, 362 Or 210, 221, 407 P3d 817 (2017) ("[W]e do not consider the meaning of a statute in a vacuum; rather, we consider all relevant statutes together, so that they may be interpreted as a coherent, workable whole.") (citing *Lane County v. LCDC*, 325 Or 569, 578, 942 P2d 278 (1997)); *Gaines*, 346 Or at 177 n 16 ("Ordinarily, only statutes enacted simultaneously with or before a statute at issue are pertinent context for interpreting that statute."). The legislature enacted subsection (3) of ORS 317.267 in 1985, as part of a large technical corrections bill making numerous changes to the 1984 corporation excise tax overhaul act referred to above. *See* Or Laws 1985, ch 802, § 33; *see also* Tape Recording, House Committee on Revenue and School Finance, Subcommittee on Income Tax, HB 2011, May 9, 1985, Tape 213, Side A (testimony of Elizabeth Stockdale) (testifying, as attorney-in-charge for tax section of Oregon Department of Justice, that bill was necessary to "eliminate * * * ambiguities" because 1984 bill "was drafted in kind of a hurry"). Then as now, the UDITPA formula in ORS 314.650 and ORS 314.665 was not the only apportionment formula allowed or required under Oregon

law.[30] The department has identified two circumstances in 1985 in which uneliminated business income from dividends was entirely excluded from the apportionment formula. First, the formula for airlines, under ORS 314.280 and what is now OAR 150-314-0078, provided: "Passive income items such as interest, rental income, dividends, etc., will not be included in the denominator * * *." OAR 150-314.280-(G)(3)(b)(D) (1983). Second, for any taxpayer, a rule under the "fairly represent" provision in ORS 314.670 provided:

> "Where business income from intangible property cannot readily be attributed to any particular income producing activity of the taxpayer, such income cannot be assigned to the numerator of the sales factor for any state and shall be excluded from the denominator of the sales factor. For example, where business income in the form of dividends received on stock, royalties received on patents or copyrights, or interest received on bonds, debentures or government securities results from the mere holding of the intangible personal property by the taxpayer, such dividends and interest shall be excluded from the denominator of the sales factor."

*Former* OAR 150-314.670-(C)(3) (1983).

Taxpayer's position, that inclusion of the unsubtracted portion of a dividend is the implied logical corollary of the express exclusion of the subtracted portion, would mean that the legislature also intended to include the unsubtracted portion in the formula in both of these circumstances. The court finds it unlikely that the legislature had that intention because the result would be that in both circumstances other "passive" receipts attributable to the "mere holding" of intangibles would remain fully excluded, while the unsubtracted portion of dividends would have to be included even if the airline or other taxpayer was a merely passive holder of the stock. Taxpayer offers no reason why the legislature would have wanted to single out passive interests in stock for treatment different from passive interests in other intangibles, and the court sees no reason to think that the legislature would have considered that treatment more fair or accurate than complete exclusion of

---

[30] The court reads the reference to "any" apportionment formula in subsection (3) as a recognition that a variety of formulas exists.

the receipts. The court finds the department's explanation more logical: The legislature did not intend subsection (3) of ORS 317.267 to address the inclusion or exclusion of the unsubtracted portion of a dividend. Based on the statutory context, the court tentatively concludes that subsection (3) leaves it to the substantive law governing the particular apportionment formula applicable to the taxpayer to determine inclusion or exclusion.

The court finds nothing in legislative history that changes this conclusion. The department has presented an analysis of the legislative history from both 1985 and 1984. Unsurprisingly, given the bulk of the bill, neither party has proffered legislative history that specifically addresses the addition of ORS 317.267(3).

This leaves taxpayer's arguments based on maxims of statutory construction. The principle that "*inclusio unius est exclusio alterius*" may be useful in the absence of other evidence of legislative intent, but it cannot overcome the strong indicators in the statutory context discussed above. As to the principle that the more specific intent controls, the court concludes that taxpayer erroneously assumes that the legislature has articulated in ORS 317.267(3) a specific intention to require inclusion of the unsubtracted dividend in the sales factor. The legislature did not do that, however; it was silent on that point. Taxpayer's argument assumes the conclusion that it seeks.

The court will deny taxpayer's motion.

B. *Department's Issue: Does ORS 314.665(6)(a) exclude from "sales" the unsubtracted portions of the Dividends and Subpart F Income?*

The department's motion is based on the following provision enacted as part of the 1995 statute discussed above:

"For purposes of this section, 'sales' excludes:

"(a)  Gross receipts arising from the sale, exchange, redemption or holding of intangible assets, including but not limited to securities, unless those receipts are derived from the taxpayer's primary business activity."

ORS 314.665(6)(a).[31] The department contends that the Dividends and the Subpart F Income are excluded from "sales" under the first part of the statute because they "arise from" taxpayer's "holding" of the CFC stock, within the plain meaning of those terms. The department argues further that the Dividends and Subpart F Income are not reincluded in "sales" because taxpayer's "primary business activity" is the sale of software, rather than the receipt of dividends from holding the CFC stock. Taxpayer argues that the Dividends and Subpart F Income are not excluded; or if they are, they must be reincluded pursuant to the "primary business activity" provision in the last clause of the statute. The court starts its analysis with the text and context of the exclusionary provision before proceeding to the reinclusion provision.[32]

1.  *Exclusionary provision of ORS 314.665(6)(a)*

Taxpayer's shares of stock in the CFCs unquestionably are "intangible assets" within the plain meaning of that term. *See Tektronix*, 354 Or at 543-44 (citing dictionary definition that includes "stocks"). The terms "arising from" and "holding" require further analysis under the *Gaines* framework, as applied in *Tektronix*.

a.  Text: "arising from"

As of 1995, the most relevant plain meaning of "arise" was "to originate from a specified source." *Webster's* at 117

---

[31] The 1995 law also excluded from "sales":

"Gross receipts arising from an incidental or occasional sale of a fixed asset or assets used in the regular course of the taxpayer's trade or business if a substantial amount of the gross receipts of the taxpayer arise from an incidental or occasional sale or sales of fixed assets used in the regular course of the taxpayer's trade or business. Insubstantial amounts of gross receipts arising from incidental or occasional transactions or activities may be excluded from the sales factor unless the exclusion would materially affect the amount of income apportioned to this state."

Or Laws 1995, ch 176, § 1 (adding subsection (b) to ORS 314.665(6)). A 1999 amendment limited the exclusion under ORS 314.665(6)(a) in ways not relevant to this case, declaring that "sales" "[i]ncludes net gain from the sale, exchange or redemption of intangible assets not derived from the primary business activity of the taxpayer but included in the taxpayer's business income." Or Laws 1999, ch 143, § 8 (adding subsection (b) to ORS 314.665(6) and renumbering the "occasional sale" provision as new subsection (c)).

[32] Except as noted below, the court has found nothing helpful in the legislative history of ORS 314.665(6)(a).

(unabridged ed 1993). "Originate," in the foregoing intransitive usage, meant "to take or have origin : be derived : arise, begin, start," as in "the train originated in Washington." *Id.* at 1592. "Origin" referred to "ancestry" or "parentage," as well as the "rise, beginning or derivation from a source" or the "primary source or cause : fountain, spring." *Id.* at 1591. The term "arise" also had an established legal meaning, but that meaning was indistinguishable: "To spring up, originate, to come into being or notice ∗∗∗." *Black's* at 108 (6th ed 1990).

Applying this definition, the court concludes that "arise from" was an elastic term that could refer to a clear, immediate source (as the reference to "parentage" suggests) or to one that was more diffuse or attenuated (as suggested by the references to "ancestry" and to the city of "origination" of a train that might have stops along the way). However, if the statute included a "specified source," the court need look no further. As used in ORS 314.665(6)(a), the court easily concludes that the plain meaning of "arising from" referred to the immediate "sources" of gross receipts that the legislature "specified" in the same sentence: a sale, exchange or redemption of stock, or the payment of a dividend on stock held by the shareholder.

b.   Text: "holding"

In *Webster's*, the first listed definition of the verb "hold" was synonymous with "possess": "to retain in one's keeping : maintain possession of : not give up or relinquish." *Webster's* at 1078 (unabridged ed 1993). The many additional listed meanings generally referred to various kinds of control or power over an object, for example, "to impose restraint upon or limit in motion or action," "to have or keep in the grasp," and "to receive and retain." *Id.* Similarly, the first definition in *Black's* was "[t]o possess in virtue of a lawful title; as in the expression, common in grants, 'to have and to hold,' or in that applied to notes, 'the owner and holder.'" *Black's* at 730 (6th ed 1990). From these definitions, the court concludes that the plain and technical legal meaning of "arising from" the "holding" of intangible assets was that the gross receipts at issue must originate from the possession or legal ownership of the shares.

c.  Conclusion under *Tektronix* regarding exclu-
sionary provision of ORS 314.665(6)(a)

The department posits a meaning of "holding" that would exclude all dividends, even those paid by a subsidiary owned entirely by the parent company and engaged in the same unitary business, because the immediate source of the dividends as such is the parent's possession of the shares. In its original opinion, the court declined to accept this interpretation on the grounds that describing the relationship of a parent company to a wholly owned unitary subsidiary as the "holding" of stock is so broad as to be inaccurate because it fails to fully describe legal entities that, by definition, are under common control and share centralized management, economies of scale, and functional integration. *See* ORS 317.705(3)(a).

On reconsideration, the court accepts that the Dividends and Subpart F Income "arose from" taxpayer's "holding" of the CFC stock as described above, even though "holding" does not fully capture the depth of a unitary relationship, such as the one between taxpayer and the CFCs in this case. The court is guided by the Supreme Court's interpretation of the exclusionary provision in *Tektronix*, where the court relied on the uncontroverted fact that the goodwill at issue was an "intangible asset" and saw no need to look beyond that to the subset of "liquid assets" specifically discussed in the legislative proceedings. *See Tektronix*, 354 Or at 545 (referring to "legislature's decision to address a narrow problem with a broader solution"). Moreover, upon closer examination, the court concludes that the legislature adequately addressed dividends from a unitary subsidiary in the reinclusion provision.

2.  *Reinclusion provision of ORS 314.665(6)(a)*

The court proceeds to examine whether the last clause of ORS 314.665(6)(a) requires the Dividends and Subpart F Income to be reincluded in the definition of "sales."

a.  Text: "derived from"

As of 1995, the plain meaning of "derive" included "to take or receive especially from a source"; to "obtain or gain through heredity or by transmission from environment

or circumstance"; to "acquire, get or draw (as something pleasant or beneficial)," as in "the mutual benefits that nations can *derive* from trading which flows in both directions"; and to "adapt," as in "a movie *derived* from a novel." Additional definitions included "to be descended or formed from," as in "all were probably *derived* from the same ancestral stock." *Webster's* at 608 (unabridged ed 1993) (emphases in original). These definitions contemplate that something will be transferred to a new person, place or thing, but they otherwise overlap substantially with the term "arising from." *See also id.* at 1592 (listing "arise" and "be derived" as synonyms for "originate").

The contemporaneous definition of "derive" in *Black's* is: "To receive from a specified source or origin. * * * To proceed from property, sever from capital, however invested or employed, and to come in, receive [*sic*] or draw [*sic*] by taxpayer for his separate use, benefit, and disposal." *Black's* at 444 (6th ed 1990). *Black's* cites two federal income tax cases that focus on the requirement that someone actually "receive" the amount at issue before it can be considered "derived" and therefore "income." *See Crews v. Commissioner*, 89 F2d 412, 416 (10th Cir 1937) (statutory definition of "gross income" as "derived from" various sources implies that taxpayer must "receive" the amount at issue before it becomes "income"). That final step is referred to as a "realization event." *See Staples v. United States*, 21 F Supp 737, 739 (ED Penn 1937) ("gain is, however, not taxable until it is realized"). The court concludes that this technical meaning of "derive" is a subset of, and is not inconsistent with, the plain meaning.

As with "arising from," the court concludes that both the plain and technical legal meanings of "derived from" direct the court to look to any "specified source" in the statute and to look no further if the statute identifies one. In the statute at issue, that source is the taxpayer's "primary business activity."

b.   Text: "primary business activity"

Neither the phrase "primary business activity" nor any of its component words is defined by statute. The court focuses on "primary" and "activity." As the department points

out, the plain and technical meanings of "primary" are "first," "chief," or "principal" (quoting *Black's* at 1190 and *Webster's* at 1800 (2002)). The court finds that the concept of "primary" requires a comparison of at least two things, all of which, under the statute at issue, must be "activities."

As of 1995, the first and second dictionary definitions of "activity" were, respectively, the "quality or state of being active" and "physical motion or exercise of force *** : liveliness." *Webster's* at 22 (unabridged ed 1993). "Business activities" appeared as one example under the definition "an occupation, pursuit or recreation in which a person is active." *See id.* The third definition was "natural or normal function or operation." *Id.* The first and second definitions of "active," in turn, were "characterized by action rather than by contemplation or speculation," and "productive of action or movement." *Id. Black's* defined "activity" as "[a]n occupation or pursuit in which [a] person is active," and "active" as "[t]hat is in action; that demands action; actually subsisting; the opposite of passive." *Black's* at 32-33 (6th ed 1990). A provision of the Internal Revenue Code that was specifically incorporated in Oregon law referred to losses from a "passive activity," which paradox is explained in the term's definition as "any activity *** which involves the conduct of any trade or business, and in which the taxpayer does not materially participate." IRC § 469(c)(1)-(2) (1993); ORS 314.300 (1993). It was fundamentally the lack of participation by the taxpayer, therefore, that caused an endeavor to be "passive" with respect to that taxpayer.[33] *See* Bittker & Lokken, ¶ 28.1 ("Very generally, a 'passive activity' is an investment in a trade or business in which the investor is not an active participant or in a rental activity."). The court concludes that the plain meaning, as well as the legal and income tax-specific definitions, connoted a degree of movement or exertion of energy. These definitions cast doubt on the possibility that an "activity" might encompass the "holding" of stock or other property. The court turns to relevant context, starting with the key term "primary business activity."

---

[33] "Passive activity" also included "any rental activity," but an exception caused even rental activity to be nonpassive if the taxpayer performed more than 750 hours of services in real property trade or businesses and met certain other requirements. *See* IRC § 469(c)(7).

c.   Context: "derived from" and "primary business
activity"

Oregon's UDITPA and related statutes used the
term "activity" in ways that shed more light on the 1995
legislature's likely understanding of that term. The court
first observes that those uses clarify two basic points. First,
usage in the definition of "business income" confirms that a
taxpayer may have more than one "activity" comprising its
overall trade or business. *See* ORS 314.610(1) (1993) (defin-
ing "business income" under "transactional test" as "income
arising from *transactions and activity* in the regular course
of the taxpayer's *trade or business*" and under functional
test as "includ[ing] income from tangible and intangible
property if the acquisition, the management, use or rental,
and the disposition of the property constitute integral parts
of the taxpayer's regular *trade or business* operations"
(emphases added)). Second, examples of "activities" in other
parts of UDITPA give a sense of the level of specificity that
the 1995 legislature may have had in mind: An "activity"
could include acting as a "bank," an "investment company,"
or an "insurance company"; or the "transmission of com-
munications," the "transportation of goods or persons," or
the "production, storage, transmission, sale, delivery or fur-
nishing" of electricity, water, gas or certain other commodi-
ties. *See* ORS 314.610(4), (6) (1993). The court finds that the
UDITPA examples used the term "activity" to mean a fairly
high-level description of something the taxpayer did in its
business.[34]

The examples also generally support the court's ini-
tial interpretation of the plain meaning of an "activity" as
requiring a greater degree of engagement or participation
than the "holding" of stock. The plain meaning of "bank"
was "an establishment for the custody, loan, exchange, or
issue of money, for the extension of credit, and for facilitat-
ing the transmission of funds by drafts or bills of exchange
also : an institution incorporated for performing one or more

---

[34] A statute enacted after and outside of UDITPA, the special apportionment
regime for broadcasters, is a noteworthy exception, referring to the "activity" of
broadcasting in highly specific terms as "transmitting any one-way electronic
signal by radio waves, microwaves, wires, coaxial cables, wave guides or other
conduits of communications." ORS 314.680(1) (1993).

of such functions." *Webster's* at 172 (unabridged ed 1993). The term "investment company" had a plain meaning that suggested a passive function: "a company that holds securities of other corporations for investment benefits only — compare holding company." *Id.* at 1190. However, the definition of an investment company in *Black's* (citing federal securities law) included more active terms such as "trading" and "investing," as follows:

> "Any issuer which: (1) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities; (2) is engaged or proposes to engage in the business of issuing face-amount certificates of the installment type, or has been engaged in such business and has any such certificates outstanding; or (3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 percentum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis. Investment Company Act, § 3."

*Black's* at 826 (6th ed 1990). An "insurance company" was "a corporation or association whose business is to make contracts of insurance." *Id.* at 807. The active verbs "transmission" and "transportation," as well as "production," "storage," "transmission," "sale," "delivery," and "furnishing," in conjunction with a commodity, speak for themselves.

An administrative rule of the department offers what the court considers an important contextual clue as to whether "holding" intangible property was within the definition of an "activity." OAR 150-314.665(3)(2) (1994).[35] The rule, in language unchanged since 1973, sought to define the critical statutory term "income-producing activity," which, as discussed in the introduction above, determines whether dividends and other receipts from intangibles or services are assigned to the numerator of the sales factor and thus increase the percentage of income that Oregon may tax:

---

[35] In amending ORS 314.665 in 1995, the legislature is considered to have been aware of the department's longstanding administrative interpretation of the term "income-producing activity" within the same statutory section. *First EUB Church v. Commission*, 1 OTR 249, 260-61 (1963).

"Accordingly, income producing activity includes but is not limited to the following:

"(a)   The rendering of personal services by employes or the utilization of tangible and intangible property by the taxpayer in performing a service.

"(b)   The sale, rental, leasing, licensing or other use of real property.

"(c)   The rental, leasing, licensing or other use of tangible personal property.

"(d)   The sale, licensing or other use of intangible personal property.

"*The mere holding of intangible personal property is not, of itself, an income producing activity.*"

*Id.* (emphasis added); *see* ORS 314.665(4) (1993) ("Sales, other than sales of tangible personal property, are in this state if (a) the income-producing activity is performed in this state; or (b) the income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance.").

This portion of the "income-producing activity" rule declares the department's view that the "holding" of intangibles, "of itself," is not an "activity" at all. No other interpretation is possible, since the holding of stock obviously suffices to "produce income" for the shareholder when a dividend is paid. The legislature acted consistently with this interpretation when it referred to the "holding" of intangible assets as giving rise to receipts that must be excluded from the definition of "sales."[36] The court concludes that the 1995

---

[36] The rule went on to call for dividends from the "mere holding" of stock to be excluded from both the numerator and the denominator of the sales factor, because those receipts cannot be attributed to an "activity." *See* OAR 150-314.665(3)(b) (1994) ("Where business income from intangible property cannot readily be attributed to any particular income producing activity of the taxpayer, such income cannot be assigned to the numerator of the sales factor for any state and shall be excluded from the denominator of the sales factor. For example, where business income in the form of dividends, royalties received on patents or copyrights, or interest received on bonds, debentures or government securities results from the mere holding of the intangible personal property by the taxpayer, such dividends and interest shall be excluded from the denominator of the sales factor.").

legislature did not consider the "holding" of intangibles an "activity."

It follows from this context that the legislature did not consider the holding of stock to be a contender for ranking as a taxpayer's "primary business activity," because the holding of stock simply was not an "activity." This suggests that the department misses the mark when it compares the relative amounts taxpayer received from the Dividends and Subpart F Income, on the one hand, with the amounts taxpayer received from selling software, on the other hand, in an effort to determine which of the two was taxpayer's primary "activity."

The text of the reinclusion provision confirms the court's understanding. ORS 314.665(6)(a) directs that an amount excluded as arising from the sale, exchange, redemption or holding of intangible assets must nevertheless be reincluded if derived from the taxpayer's primary business activity. It notably does *not* say that the amount must be reincluded if the *sale, exchange, redemption or holding* of the intangibles *constitutes* the taxpayer's primary business activity. In the specific case of dividends (and subpart F income) from a unitary subsidiary owned entirely (or nearly so) by a parent corporation, it is not difficult to identify the two items that must be compared under the reinclusion provision. As discussed above, a "dividend," as defined under income tax law, is by definition paid out of the payor's "earnings and profits." IRC § 316(a) (1994). Where the payor has been continually engaged in a "unitary" business with the payee, those earnings and profits have, by definition, been earned in a "single trade or business" conducted by both of them. *See* ORS 317.705(2) (1993) ("'Unitary group' means a corporation or group of corporations engaged in business activities that constitute a single trade or business."). A "single trade or business" is a common enterprise that involves "sharing or exchange of value" among the members, demonstrated by "centralized management," "centralized administrative services" resulting in "economies of scale," or a flow of goods or other resources demonstrating "functional integration." *See* ORS 317.705(3) (1993). Such a dividend must, therefore, be viewed as income from the taxpayer's own trade or

business.[37] The two things that must be compared under the reinclusion provision are, therefore, (1) the primary business activity of the subsidiary that generated the earnings and profits out of which the dividend was paid (or to which any subpart F income is attributable) and (2) the primary business activity of the parent. If these are the same, then the dividend must be reincluded in the definition of "sales" because the dividend (or subpart F income) is "derived from" the taxpayer parent's "primary business activity."[38]

---

[37] The degree of control that a corporate parent exercises as sole shareholder reinforces this conclusion: Where the payee of the dividend owns all or nearly all of the stock of the payee, that controlling shareholder generally can elect all of the directors, who, at least under typical United States corporate law, appoint all of the officers, who in turn hire all of the employees, all of whom together with the directors and officers make all the decisions about running the business of the subsidiary paying the dividend. *See, e.g.*, ORS 60.251 (1993) (directors elected by plurality of shares entitled to vote); ORS 60.371(1) (1993) (officers appointed by board of directors). Given its high percentages of ownership of the CFCs and their consolidation with Oracle Corporation and its domestic affiliates for financial reporting purposes, the court assumes that Oracle Corporation, directly or through other subsidiaries, enjoys a similar level of control over the CFCs under the laws of their countries of incorporation. *See* Paul E. Holt, *A case against the consolidation of foreign subsidiaries' and a United States parent's financial statements, Accounting Forum* (Oct 20, 2003), *available at* https://www.tandfonline.com/doi/full/10.1016/j.accfor.2003.10.001 ("[A]ccording to generally accepted accounting principles (GAAP) in the United States, [multinational corporations] which own more than 50% of the voting stock of foreign corporations are required to prepare consolidated financial statements" unless "control is temporary" or "control does not exist.").

[38] The court finds that the United States Supreme Court's reasoning on the parallel question of "asset unity" under constitutional principles supplies additional context, of which the 1995 legislature would have been aware, that supports this court's conclusion. *See Johnson v. Gibson*, 358 Or 624, 635, 369 P3d 1151 (2016) (legislature presumed to have been aware of existing common law). In *Mobil Oil*, the Court addressed whether the taxpayer was required to apportion the income it received as dividends from subsidiaries formed under the laws of other states and other countries. The taxing state in that case was Vermont, which did not allow the taxpayer to file a combined report or a consolidated return with its unitary subsidiaries and thus, like Oregon in this case, did not "eliminate" the dividends as intercompany transactions. *Mobil Oil*, 445 US at 441 n 15. Based on the unitary nature of the business, the Court held that the Due Process Clause of the United States Constitution allowed Vermont to require the taxpayer to apportion the dividend income, as opposed to treating it as non-apportionable income taxable only in the taxpayer's state of commercial domicile. The Court stated:

"So long as dividends from subsidiaries and affiliates reflect profits derived from a functionally integrated enterprise, those dividends are income to the parent earned in a unitary business. One must look principally at the underlying activity, not at the form of investment, to determine the propriety of apportionability.

d.   Comparison with *Tektronix*

The court reviews the Supreme Court's opinion in *Tektronix* to test this court's conclusion that the Dividends and Subpart F Income are "sales" if derived from a business activity that is primary to both taxpayer and the payor CFC. In *Tektronix*, the court held that the taxpayer's receipts attributable to goodwill upon the sale of the taxpayer's printer division to an unrelated corporation were not derived from the taxpayer's primary business activity. *Tektronix*, 354 Or at 546-48. The court rejected the department's argument that ORS 314.665(6)(a) required the receipts to be reincluded as "sales" because they were derived from an asset that the taxpayer had "'developed *** over many years'" and that was "'central to [taxpayer's] primary business of manufacturing and distributing electronics products.'" *Id.* at 547 (quoting department's brief in this court) (brackets in original). The court easily distinguished the sale of the goodwill from the sale of electronics products; to accept the department's argument would have required the court to transform goodwill into something it was not. *See id.* at 547-48. In this case, by contrast, the Dividends and Subpart F Income are, by definition, profit from the *single* worldwide *trade or business* related to software that taxpayer conducts with domestic subsidiaries and the CFCs. For many decades before the 1984 water's-edge act, Oregon law would have eliminated the Dividends and Subpart F Income altogether as intercompany transactions. The 1984 act requires the amounts to be taken into account as dividends, and for that reason the exclusion provision in ORS 314.665(6)(a) requires them to be excluded from "sales." However, it is precisely because the amounts are dividends (or, in the case of the Subpart F Income, treated as such) that the reinclusion provision applies to them. They are profits that the CFC subsidiaries earned. And because the CFCs engage in a single, unitary trade or business with their parent, taxpayer, the

---

"*****

"*** Had [the taxpayer] chosen to operate its foreign subsidiaries as separate divisions of a legally as well as a functionally integrated enterprise, there is little doubt that the income derived from those divisions would meet due process requirements for apportionability."

*Id.* at 440-41.

amounts are derived from taxpayer's trade or business and must be reincluded in "sales" if the facts show that they also are derived from the "specified source," namely the same business activity that is "primary" for taxpayer.

## VI.   CONCLUSIONS

As discussed, taxpayer's motion under ORS 317.267(3) must be denied as a matter of law. The court concludes that the department's motion, too, must be denied as a matter of law because the department misapprehends the comparison that must be made under the reinclusion clause of ORS 314.665(6)(a). Under the theory the court has explained above, the remaining task is to determine taxpayer's primary business activity and to identify whether that activity is the primary business activity of each CFC whose earnings and profits resulted in a Dividend or Subpart F Income for the Years at Issue. This is a factual matter as to which the parties may be able to reach agreement without the assistance of the court. The parties characterize taxpayer's primary business activity in similar terms, and each party's characterization appears consistent with the level of specificity the legislature used elsewhere in UDITPA. The department describes it as "selling software and software support." Taxpayer describes it as "developing and selling software and computer hardware." The department acknowledges that the primary business activity of at least some of the CFCs is the same as that of taxpayer, but the court does not read the department's briefing as conceding that fact as to all of the CFCs. The department refers in its motion for reconsideration to "[s]ome of the CFCs whose own primary business activity consisted of selling software and software support"; and in its motion for summary judgment that "[t]he fact that the foreign subsidiaries * * * also provide computer software and support, hardware systems, or related services to their customers as their primary activity *is irrelevant*." (Emphasis added.)

The court directs the parties to confer and to advise the court as to the need for further proceedings to resolve any remaining factual differences related to the department's motion or to other issues not covered by either party's cross-motions for partial summary judgment. Now, therefore,

IT IS ORDERED that Plaintiff's Motion for Partial Summary Judgment Pursuant to Tax Court Rule 47 is denied; and

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Partial Summary Judgment is denied.